## Walter Hauck, Appellee, v. First National Bank of Highland Park, Appellant.

### Gen. No. 9,943.

Opinion filed April 27, 1944. Opinion modified and rehearing denied June 27, 1944.

JOHN W. MUNRO, of Highland Park, and HALL & HULSE, of Waukegan, for appellant; JOHN W. MUNRO, of Highland Park, and ALBERT L. HALL, of Waukegan, of counsel.

DECKER & DOOLEN, of Waukegan, and TAYLOR, MILLER, BUSCH & BOYDEN, of Chicago, for appellee; BERNARD M. DECKER, of Waukegan, and CHARLES R. SPROWL, of Chicago, of counsel.

PER CURIAM.

Walter Hauck recovered a judgment in the circuit court of Lake county against the First National Bank of Highland Park for $10,500, on account of money to that amount alleged to have been deposited in, and to have later disappeared from, a safety deposit box rented by appellee from the bank, and the cause is here by the bank's appeal from the judgment.

The complaint charged a failure to use ordinary care and diligence to safely keep the money so deposited and stored in the safety deposit box, and permitting it to be taken therefrom without the knowledge or consent of appellee or his wife. The answer denied these allegations, and alleged ordinary care and diligence on

the part of appellant at all times when the safety deposit box was in its exclusive possession and not in the possession of appellee or his wife. The issues raised by the pleadings were submitted to a jury which returned a verdict upon which the judgment was entered. The jury also answered in the negative the two following written interrogatories:

"1. Did the defendant use such care and diligence in keeping and handling the safe deposit box and contents of the Plaintiff, as was customary at the time in question on the part of other institutions fairly comparable in size and other conditions to defendant in neighboring communities of the same size as Highland Park, Illinois?

"2. Did the defendant use ordinary care and diligence in keeping and handling the safe deposit box and contents of the plaintiff?"

The grounds urged for reversal are that the trial court erred in denying appellant's motion for judgment notwithstanding the verdict; that the verdict and the jury's answers to the two interrogatories are against the manifest weight of the evidence, and therefore, that appellant's alternate motion for a new trial should be granted if its claim as to the motion for judgment notwithstanding the verdict is denied by this court.

The relation between the parties was that of bailor and bailee for hire. Appellant was not an insurer of the safety of the contents of appellee's safety deposit box, but was required to use ordinary care and diligence in keeping the same. Ordinary care in such cases is such care as every prudent man takes of his own goods, and ordinary diligence in the preservation of such goods is such diligence as men of common prudence usually exercise about their own affairs. ( *Mayer v. Brensinger,* 180 Ill. 110, 113; *National Safe Deposit Co. v. Stead,* 250 Ill. 584, 594.)

Appellee relies upon *Schaefer v. Washington Safety Deposit Co.,* 281 Ill. 43, 51. In that case the money

was deposited on one date and was missing on the next occasion when the plaintiff went to the box, and meanwhile the location of the box and its plate number had been changed. The Appellate Court held that the box holder was bound to prove some act of negligence, causing the loss of her money, which she had failed to do. In reversing that holding the Supreme Court, in its opinion, said:

''The undisputed evidence was that the box was in the exclusive control of the defendant and that the plaintiff could not obtain access to it except by signing a slip at the office and giving her key to the person in charge of the vaults. Under such conditions, we see no reason to depart from the ordinary rule that where a bailee receives property and fails to return it the presumption arises that the loss was due to his negligence, and the law imposes on him the burden of showing that he exercised the degree of care required by the nature of the bailment. (*Cumins v. Wood,* 44 Ill. 416; *Sennett v. O'Brien,* 37 id. 250.) To call upon the plaintiff, under such circumstances, to prove some specific act of negligence by which her money was lost, and which she must necessarily prove by defendant's employees, would impose upon her a practically impossible burden.''

In the later case of *Miles v. International Hotel Co.,* 289 Ill. 320, 327, the court said:

''As bailee the defendant in error was bound to exercise such care and diligence in the preservation of the property intrusted to it as every prudent man takes of his own goods of like character. Ordinary diligence means that degree of care, attention or exertion which under the circumstances a man of ordinary prudence and discretion would use in reference to the particular thing were it his own property. (*Schaefer v. Safety Deposit Co.,* 281 Ill. 43.) The weight of modern authority holds the rule to be that where the bailor has shown that the goods were received in good condition

by the bailee and were not returned to the bailor on demand the bailor has made out a case of prima facie negligence against the bailee, and the bailee must show that the loss or damage was caused without his fault. (*Cumins v. Wood*, 44 Ill. 416; *Schaefer v. Safety Deposit Co., supra.*) The effect of this rule is, not to shift the burden of proof from plaintiff to the defendant but simply the burden of proceeding. The bailor must in all instances prove that the bailee was negligent, but when she shows that the goods which she intrusted to the bailee's care were not delivered upon demand she has made out a prima facie case or created a presumption of negligence which the bailee may overcome by offering evidence to show that it was not negligent, and if it produces such evidence, the bailor, in order to make out her case, must show that the bailee was, in fact, negligent and that its negligence caused the loss or contributed thereto. It was held in *Sanborn v. Kimball*, 106 Me. 355, that the bailee has sufficiently exonerated himself from liability when he has shown that the cause of the loss was a mystery.''

A like holding as to the burden of proof is found in *Roberts v. Minier*, 240 Ill. App. 518. The *Miles* case modifies and elaborates the rule set out in the *Schaefer* case, and the Nebraska Supreme Court in *Bohmont v. Moore*, 138 Neb. 784, 295 N. W. 419, 133 A. L. R. 270, treats the *Miles* case as repudiating the doctrine of the *Schaefer* case.

As to the claim that the court erred in denying appellant's motion for judgment notwithstanding the verdict, appellee made a prima facie case by testifying that he rented a safety deposit box, in his and his wife's name, from appellant, received two keys therefor, placed $10,500 therein on March 5, 1941, never took any of the money out, and that when he visited the box on February 3, 1942, the money was not in the box, but had been taken therefrom without his or his wife's knowledge or consent. On a motion for judg-

ment notwithstanding the verdict, the question presented is whether there is any evidence, which, taken with the intendments most favorable to appellee, tends to prove the charge of the complaint. If there is in the record evidence, which, standing alone, tends to prove the material allegations of the complaint, a motion for judgment notwithstanding the verdict should be denied, even though upon the entire record the evidence may preponderate against the plaintiff so that the verdict in his favor cannot stand when tested by a motion for a new trial. (*Walaite v. Chicago, R. I. & P. Ry. Co.*, 376 Ill. 59, 61, 62; *Lederer v. Railway Terminal & Warehouse Co.*, 346 Ill. 140, 145; *Knudson v. Knudson*, 382 Ill. 492, 494.) The trial court did not err in denying appellant's motion for judgment notwithstanding the verdict.

The remaining question is whether appellant's motion for a new trial should have been granted because the verdict and the jury's answers to the two written interrogatories are against the manifest weight of the evidence.

The record discloses that appellee had been a resident of Highland Park since June 1, 1937, living in a home which he built in 1936. He had been a cosmetic salesman for the Yardley Company Ltd. of New York for 16 years, being retired by his employer on June 1, 1943, and was unemployed at the time of the trial. Prior to that employment he represented another cosmetic manufacturer for 4 or 5 years in Texas and still another for 3 or 4 years in Chicago. He conducted a drug store in Atlanta, Georgia, for about 2 years, and at different periods lived in San Francisco, California; St. Louis, Missouri; Louisville, Kentucky, and Chicago, and at the time of the trial had sold his home in Highland Park and was planning to go to Florida. About May 1938, he rented, in his and his wife's name, from appellant, safety deposit box No. 331 and received two keys thereto. He kept some life insurance policies,

shares of corporate stock, gold certificates, gold coins, the deed to his home and other articles in the box. He opened a checking account with appellant during the latter part of the year 1938, in which he deposited the proceeds of his drawing account and commissions, and by the end of February 1941, his balance, including $5,000 which he testified came from the sale of his interest in a Texas farm, had reached the sum of $11,729.57. During the latter part of that month or. the first few days of March 1941, he applied to one of the tellers for $10,500 in $500 bills, which appellant procured from the Federal Reserve Bank, and on March 5, 1941, the bills were delivered to him upon his check for that amount. Appellant's records show that this transaction took place at about 9:15 a. m., and that at 9:17 a. m. on the same day appellee visited his safety deposit box. He testified that when the teller handed him the bills, he asked for a brown envelope, and upon the teller's saying he had none, he, the witness, put the money in his pocket with his hand on it, went to the safety deposit vault, where the custodian let him into his box, opened the door for him and raised the lid, and that he placed the bills in the box without leaving the vault. The admission slip signed by him at that time bears the notation "vault only" written by the vault custodian. He never informed any of the officers or employees of the bank that he was putting into or had any money in the box, and the vault custodian who unlocked it for him with one of his (appellee's) keys and the bank's guard key, testified that he never at any time saw the $10,500, and did not know it was in appellee's box. The vault record cards show, and appellee testified that he visited the box on June 17, 1941, June 24, 1941, July 1, 1941 and February 3, 1942. He further testified that on June 7, 1941, he went to the box to·put two $100 defense bonds therein and that on that occasion he put the $10,500 in an old brown envelope which he had had for a good many years, and

that was in the box; that the visit of June 24, 1941, was to procure the bonds for a correction therein and that the box was not taken from the vault; that on July 1, 1941, he took his deposit box to one of the booths to examine the terms of an annuity insurance policy, after which he replaced the policy in his box, put the box back in the vault and went upstairs; that he then remembered the two defense bonds which had been corrected, and went back to his box, where the vault custodian raised the lid for him, and he (appellee) put the corrected bonds in the box and came out of the bank. His vault card shows only one entrance to his box on that day.

When he first talked to some of the officers of the bank about the money being gone, he described it as being ten $1,000 bills and one $500 bill. He testified that he withdrew the money from his checking account because of discussion of what was going to happen to everybody, and deposits being insured up to only $5,000, he wanted to use the money to buy a farm and figured that when he found one he liked, he could re-deposit the money and draw a check on it, and had no reason for withdrawing it except for safekeeping. Mr. Erskine, vice president and trust officer of the bank, testified that appellee told him and Mr. Munro, the bank's attorney, on February 3, 1942, after claiming the money was gone, that the reason he put the money in the safety deposit box was because he was afraid the government might freeze deposits and he would be compelled to take bonds. Appellee testified he could not say whether he made that statement.

The bank building faces south, and consists of the main banking floor and a basement. The safety deposit vault is in the basement, not touching any outside wall of the building. In front of the vault on the east side thereof is the vault lobby, reached by a stairway coming down from the center of the rear portion of the banking floor lobby. The stairway and vault lobby are

accessible to the public. Behind this stairway to the north is a private elevator, which, on the banking floor communicates with private passages leading to the teller's cages on each side of the banking lobby, and in the basement it opens onto a service lobby, which connects on the south with the vault lobby, and on the west with the directors' room. East of the stairway there is a ladies' room in the basement, opening onto the vault lobby, and south of the ladies' room there are five customers' booths, each provided with a door which can be locked. The vault is in the custody of the vault custodian, who has a desk between the customers' booths and the door of the vault. On the custodian's desk is a complete Rand-McNally cabinet with a card index of the names and box numbers of the safety deposit box holders. There is also an automatic time stamp, which stamps on each box holder's card the year, month, day, hour and minute of each access to a box, and to which the box holder is required to affix his signature whenever he enters the vault. While the cabinet and stamp are not locked, they are in the custody of the vault custodian, and he keeps a duplicate book record made by him, in a small room opening off the vault lobby.

A private stairway leads down from the work space near the south-east corner of the banking floor back of the east row of tellers' cages to the south room of the basement, from which a door that is kept locked, communicates with the south end of the vault lobby, and in the south room there is an old vault used for storing books.

The safety deposit vault is made of reinforced concrete, the floor, walls and ceiling having a net work of wires and lead cables four or five inches apart, into which the vault door is also wired, making a closed electric circuit that turns on an alarm inside and outside the bank if the circuit is broken. The vault doorway is of the vestibule type, with an outer door eight

to ten inches thick, having two combination locks and a triple time lock. The inner door also has a combination lock, and is in two sections that fold back against the sides of the vestibule when open. During business hours the vault doors remain open, a ramp or runway is placed from the sill of the vault door to the floor of the lobby, and the vault doorway is barred by a locked day gate made of metal grill work, swinging on an extension hinge, and having a spring lock and a spring that swings it shut. The vault contains approximately 2,500 safety deposit boxes, located on the north and south sides and down the middle thereof in a back to back tier. 535 boxes, of which appellee's box was one, were acquired by appellant from the receiver of the North Shore Trust Company in May 1935 for $300. They are Mosler boxes, and were installed in the vault by a company that specializes in that kind of work. The two keys furnished appellee by appellant are the original keys supplied with the boxes by the manufacturer, marked with the letter ''M'' to indicate their make.

The only persons having a key to the day gate are Mr. Erskine, vice president and trust officer, Mr. Hart, assistant cashier, and Mr. Blasier, the vault custodian. All of the funds and securities of the bank are kept in the safety deposit vault at all times, except that such amounts as are needed for the day's transactions are taken upstairs in the morning and returned at the close of the business day. The reserve cash of the bank, averaging $50,000, and the bank's collateral and securities, are kept in seven of the safety deposit boxes, and there is in the vault a combination safe in which the bank's reserve silver is kept. The vault also contains four tellers' safes, each having a combination lock, in which the funds used during the business day are kept outside of banking hours. Each teller has the combination of his particular safe. The signature of two of the bank officers is required to gain access to any of

the deposit boxes used by the bank, except that Mr. Grant, who is vice president, cashier and managing officer, has access to the collateral box upon his own signature.

Two keys are issued to each holder of a box, and none of the boxes can be opened without the use of one of those keys, together with the guard key, commonly known as the master key, and the box holder's key cannot be inserted all the way into the lock until the guard key is inserted and turned up. The guard key is in the personal possession of the vault custodian at all times, except while the vault is closed between the end of one business day and the beginning of another. At such times it is locked inside the vault. The only other time it is not in the possession of the regular custodian is when he is at lunch or on vacation, at which time the relief custodian, Mr. Frantz, an employee of the bank for 15 years, is the usual relief custodian, and Mr. Glandt, the head bookkeeper, occasionally acted.

The only persons knowing the combination of the vault doors are Mr. Erskine, Mr. Hart and Mr. Grant. The time lock on the outer door is set at 3 o'clock p. m. each business day, checked by one of the three officers named, the vault doors are closed and locked by the vault custodian in the officer's presence at the close of business, and the vault cannot be opened until the hour set by the time lock, 8 o'clock a. m. of the next business day, and then only by one of the three officers having the combinations. Before banking hours when the vault is opened, the tellers come down stairs and get their cash from the teller's safes, and their four cabinets or busses are wheeled out of the vault and taken upstairs on the elevator to their cages, by the vault custodian. Two of the cabinets are taken at a time, and at the close of the business day the vault custodian goes up to the teller's cages and returns the cabinets to the vault for the night. This takes from 5 to 15 minutes each morning and evening. The day gate is al-

ways closed and locked while the vault custodian is bringing the tellers' cabinets downstairs after the close of business, and is always closed and locked while he is taking them upstairs in the morning unless some of the tellers or officers are in the vault at that time, and in that case the day gate is locked as soon as they are out of the vault. The tellers are not required to sign a card for access to their safes in the vault, but are required to do so when entering the vault for access to their individual deposit boxes. All officers, except Mr. Grant, and Mr. Hart, assistant cashier, are required to sign cards whenever they enter the vault, and the vault custodian keeps a record of Mr. Grant's entrances.

The keys to unrented boxes are kept locked up in one of them, the key to which is in the possession of the vault custodian, kept by him on a key ring with the guard key and the key to the day gate. The lock and the keys of any box surrendered by a box holder are changed if the bank does not have confidence in the way the box holder has kept his keys, or if only one of the keys is returned.

Whenever a box holder with whom the custodian is acquainted, desires access to his box he is required to sign a card pertaining to his box, showing the time of his visit, and he is then admitted to the vault by the custodian, who goes in with him, and locks the day gate behind them, locking it again when they leave the vault. The vault custodian uses the customer's key and the guard key, one in each hand, to unlock the cubicle in which the box is locked. The box holder may enter his box without taking it from the vault, if he desires, in which case the entrance card is marked with a note so showing. If a box holder takes his box to one of the booths in the vault lobby, the vault custodian gives him back his key with the box. The custodian always examines the booth after the box holders come out of it, to ascertain if anything has been left out of the box,

and such articles, if any, are promptly returned to the box holder.

When the vault is cleaned it is always done by the janitor in the presence of the vault custodian. The vault mechanism is inspected and oiled monthly by Mr. Agers, service man, who also attends to anything else the bolts or deposit boxes need. During the period in question the vault was never entered by any outsider, there were no burglaries or hold ups, there was no loss of any money of the bank, and during the entire existence of the bank, a period of about 20 years, there has never been any complaint, except by appellee, of any loss by a safety deposit box holder.

When the particular group of boxes was acquired, appellant made no investigation into the identity of the former box holders, and did nothing about changing the box numbers, or the locks or keys, but had them inspected by Mr. Agers to see that they operated. The North Shore Trust Company, former owner of the boxes, acquired them from the manufacturers on May 17, 1929. The Trust Company's record and the receiver's record, show that the particular box in question was rented only to H. O. Huber and his wife, who held it from September 1, 1930, until the receiver closed it out on December 6, 1934, shortly before it was sold to appellant in March 1935, after which, before appellee rented it, only one other person, Mrs. Clara P. Atkins, was the lessee. Both keys were turned in each time it was surrendered and the testimony of these holders shows that no one else had access to the keys and that no duplicate was made. During the time the keys were in the possession of the receivers they were kept in a special box kept locked the same as any other safety deposit box, and the guard key to the special box was kept in the receiver's office. There was no mark on the cubicle or the door of appellee's box which showed any tampering with it.

The bank used care in the selection of all of its employees. The only persons connected with the bank who had access to the safety deposit vault were the four officers of the bank above named, the five tellers, and the vault custodian, and their access could be had only under the circumstances and restrictions above related. Every one of them was known to Mr. Grant, the employing officer, for many years, with a good background and history, and each of them had been in the bank's employ a long time. All of the employees who had access to the vault, except Mrs. Peterson, a savings teller, now a nonresident of the State, testified they knew nothing about appellee having any money in the vault, and knew nothing about its disappearance. Mrs. Peterson had been employed through Mr. Appel, the president of the bank, for whom she worked at Wilmette for a number of years.

In a deposition by appellee on July 30, 1942, he testified that Mr. Frantz acted as vault attendant upon the occasion of his visit to his box on July 1, 1941. At the trial he testified that Mr. Frantz was vault attendant on one occasion and he thought it was on July 1, 1941. All his vault tickets are made and initialled by Mr. Blasier, and Mr. Frantz testified that he was on his vacation on July 1, 1941; that he had verified it by the bank records, and that so far as he knew he never waited on appellee in the safety deposit vault. Some time in 1942, after appellee claimed the money was missing from his box, he saw Mr. Frantz in the Northwestern Railway Station, asked him his name and if he worked at the Highland Park bank.

Representatives of four other banks of Lake County testified to the manner in which their safety deposit vaults were operated. In three of them the safety deposit vaults are separate from that in which the bank's funds are kept. One of the three has no day gate, and in two of them the customer's key remains in the cu-

bicle door while the customer takes his box to a booth. One of them observes the same practice as appellant as to signing and stamping entry tickets, protection with regard to custody of keys to unrented boxes, and changing locks on surrendered boxes. In one of them, where the safety deposit vault is separate from the bank vault, all the boxes were bought new, the customer must take his box to a booth, none of the bank's property is kept in that vault, all locks are changed when a box is surrendered, and all officers and tellers must sign entry tickets when entering it. In the case where there is only one vault, and it is situated on the banking floor, the method of operation is very similar to that employed by appellant, except that no tellers' carts are kept in the vault. These banks and these communities were fairly comparable in size and surroundings to appellant and the City of Highland Park. The practices of such banks is competent evidence on the question of ordinary care and diligence. (*Bank of Grottoes v. Brown* (C. C. A. 4th), 8 F. (2d) 321, 42 A. L. R. 1304.) The testimony on the part of appellant shows that it was conducting its safety deposit business with as much care and diligence as the banks in the surrounding communities. It gave the box holders' property the same protection that it gave its own funds. They were both kept in the same vault, in the same kind of container, *viz;* a safety deposit box, except the bank's silver, which was kept in a separate chest. None of the boxes could be entered unless the vault custodian was present and used the guard key.

Inasmuch as there were no marks on the cubicle or the door of the box, it is obvious that the box was not entered by physical violence. The fact that the day gate was sometimes left unlocked for a few minutes in the morning, before the bank was open, while the tellers were taking their cash from their safes in the vault, during which time the vault custodian was taking their cabinets upstairs, does not tend to show that

any of the tellers or anybody else could have entered any of the safety deposit boxes while the custodian was away from the vault, for the testimony shows that the guard key, without which no box could be opened, was in his personal possession. His possession thereof, at all times except when it was locked in the vault at night, also answers appellee's contention that the failure to change locks on the boxes bought from the receiver of the North Shore Trust Company and on surrendered boxes, or to investigate the record of former box holders, constituted negligence on the part of appellant. So far as unauthorized duplicate keys are concerned, it is always possible that such keys exist, whether boxes are acquired second hand or are purchased directly from the manufacturer. Appellee's claim that appellant was negligent because the identity of the former owners of the boxes was not investigated and the locks and keys were not changed and because the employees of the three receivers of the North Shore Trust Company had access to the boxes and the keys, including the guard key before they were sold to appellant is without merit. Even if there were unauthorized duplicate keys, or if a former box holder was of ill repute, access to any of the deposit boxes could not be had except in the presence of the vault custodian, and the use of any unauthorized duplicate key would be impossible without his connivance. The boxes purchased by appellant from the receiver of the North Shore Trust Company were inspected for the bank by a regular service man, the locks were found to operate, and because of the guard key, were no more unsafe than new boxes bought directly from a manufacturer. The good reputation and long service record of the tellers entitled appellant to rely upon their honesty and integrity. That any of them might have had an unauthorized duplicate box holder's key or a duplicate guard key was not within the realm of probability so as to put appellant upon notice re-

quiring any inquiry or investigation in that line. No outsider had any access to the vault at any time without the presence of the vault custodian or one of the relief custodians.

The fact that the card index in the lobby of the vault was not locked does not tend to show negligence. It was in front of the vault door and it is not shown or claimed that the vault custodian could not see it at all times when the public was admitted to the lobby, even though he might be in the vault. It is not claimed that any unauthorized person ever looked into the card index or that knowledge of its contents, however, obtained, would enable or assist any unauthorized person to gain access to any deposit box.

The situation narrows to this: No unauthorized non-violent entry into any safety deposit box was possible without the connivance and assistance of the vault custodian, with the use of the guard key. All that any bank can do to guard against such activity is to use care in the selection of its personnel. The custodian and the relief custodians in this case were selected with care. Mr. Grant, the employing officer, knew Mr. Blasier, the regular custodian, for 30 or 35 years, he knew Mr. Frantz from his childhood, and Mr. Glandt came out of high school into the bank's bookkeeping department. Each of the two latter were 31 years old, and had been in the bank's employ 15 and 13 years, respectively. Mr. Blasier had been employed by the bank since 1917 or 1918 and had been vault custodian since 1924.

We are of the opinion that appellant overcame the prima facie case made by appellee, and fully established, not only that it used ordinary care and diligence to protect and keep safe the contents of appellee's safety deposit box, but that it used the same care and diligence in so doing as it used to protect its own property, and that it was not guilty of any actionable negligence.

The verdict was against the manifest weight of the evidence, and the trial court erred in refusing to set it aside and grant a new trial. The judgment is reversed and the cause is remanded.

*Reversed and remanded.*