## Mona E. Dunne, Appellee, v. South Shore Country Club, Appellant.

## Gen. No. 27,699.

1. BAILMENTS—*sufficiency of instruction as to necessity for bailee to rebut prima facie showing of negligence.* An instruction "that where a bailor has shown that goods were received in good condition by the bailee from the bailor and were not returned to the bailor, on demand, the bailor has made out a case of prima facie negligence against the bailee. A bailee must show that the loss or damage, if any, was caused without his fault," is not objectionable for failure to state that after the bailor had made out a prima facie case of negligence it is "then" the obligation of the bailee to show that it was without fault.

2. BAILMENTS—*instruction requiring bailee to show due care not erroneous for failure to define care.* It was not error to instruct that after the bailor had proven that her property was placed in the hands of the bailee and not returned upon demand "the law presumes negligence on the part of the bailee and imposes upon such bailee the burden of showing that such bailee exercised such care in respect to the property as was required by him under the circumstances surrounding the bailment," even though "care" was not defined.

3. INSTRUCTIONS—*refusal to give instruction not error where substance covered in other instruction.* It was not error to refuse to give a requested instruction where the substance of such instruction is contained with more elaboration in another instruction given at the request of the same party, especially where the refused instruction is misleading under the evidence.

4. BAILMENTS—*refusal to give inapt instruction not error.* It was not error to refuse to instruct the jury that "if you believe that the loss of these goods is a mystery, resulting from no known cause, and attributable to no negligence on the part of the defendant, then, in either of such cases, you must find the defendant not guilty," in an action by a bailor against a bailee for the value of goods checked with the bailee and either stolen while in its possession or delivered by it to the wrong person, where the evidence did not justify such instruction, there being nothing mysterious about the case.

5. VALUES—*sufficiency of proof of value of articles lost by bailee.* A verdict for $999 for a fur coat, a pair of carriage boots and two pairs of kid gloves lost by a bailee is sustained by evidence that the bailor paid $1,050 for the fur coat about three months before it

was lost, and $8 for the boots and $15 for the gloves, and an employee of the merchant who sold the coat testified that such price was paid for it and that it was of that value at the time it was lost and there was no contradictory evidence as to the value of the articles.

Appeal by defendant from the Municipal Court of Chicago; the Hon. ROBERT E. GENTZEL, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1922. Affirmed. Opinion filed June 20, 1923.

WINSTON, STRAWN & SHAW, for appellant; HAROLD BEACOM, of counsel.

DUNNE & CORBOY and FRANK T. FITZSIMMONS, for appellee; E. F. DUNNE, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff, Mona E. Dunne, having checked some wearing apparel with the defendant, the South Shore Country Club, and shortly thereafter having requested its delivery to her, which was refused, brought suit and recovered a judgment against the defendant in the sum of $999 with costs. This appeal is therefrom. The evidence is substantially as follows:

New Year's Eve, December 31, 1920, the plaintiff, Mona E. Dunne, as a guest of Cecil Corboy, a member of the South Shore Country Club, the defendant, attended a party at the defendant club. The plaintiff, between 7:30 and 8:00 p. m. went to the club with her sister-in-law and brother, Maurice Dunne, and as soon as she entered met her hostess, Miss Corboy. The club is located on the south side of the City of Chicago on Lake Michigan. There is a men's check room to the left as you enter the front door and a ladies' check room to the right. The plaintiff upon entering went into the ladies' check room and checked a fur coat which contained two pairs of white kid gloves in one of the pockets; a small vanity case and a pair of car-

riage boots. She was given a check for the things which she deposited. On the night in question there were a number of girls as employees in the check room in question, and there were racks for clothing both on the west side and the east side of the room, and counters of some kind in front of them. Beyond the check room there was a ladies' rest room with an entrance from the check room. The rest room, including a toilet room, is about twenty-five feet by twelve. On the night in question about eight girls were employed in the checking room. In that room there were twelve racks on the right side and two on the left. The girls were all employees of the club. There was also a girl on duty in the rest room. The check room has about six windows, the bottoms of which were eight feet from the floor. In the ladies' rest room there were three or four windows and two in the toilet room. The night being cold the windows in the check room were closed. The evidence does not show whether they were locked or unlocked. The girls employed in the check room were under the supervision of a housekeeper, Mrs. Cortwright. Ordinarily but two girls were employed in the check room. On the evening in question two detectives, furnished by the City of Chicago, were stationed on the main floor. About two thousand persons visited the club that night, approximately half being women and half men. The girls in the women's room took care of the apparel of the thousand women. About 3:30 a. m. the next morning the plaintiff presented her check and it was found that the things she had checked were missing. A search was made for them but they were never found.

One Rosie Kavacek, who was head laundress, and had been employed by the club for ten years, had charge of the left side of the check room on the night in question. About three a. m., while in charge of her part of the checking room, she heard some woman in the rest room scream, and she went in and helped her, be-

ing gone from her stand about three or four minutes. She had worked, as a laundress, from six a. m. to three p. m. and then, in the check room, from seven p. m. to three or four of the morning in question. She testified that before she left the room to take care of the woman in the rest room she said to one of the other girls, "You look after my cloaks." At that time there were only seventeen, of the two hundred wraps which she had charge of, left.

The plaintiff in October, 1920, at Marshall Field's, paid $1,050 for the squirrel coat which, on the night in question, she checked at the club. With it, she checked a pair of carriage boots, worth, she testified, $8, and two pairs of kid gloves, worth $15.

The following interrogatories: "Do you believe that the defendant provided a safe place in which to keep the property of its guest when intrusted to its care? Do you believe that the defendant employed and provided * * * competent and trustworthy help to handle the property of its guests when intrusted to its care? Do you believe that the defendant, under the particular circumstances in this case, exercised the same degree of care in keeping the property of the plaintiff that a person of ordinary prudence would exercise in the care of his own property of equal value? Do you believe that the defendant, under the particular circumstances in this case, exercised a greater degree of care in keeping the property of the plaintiff than a person of ordinary prudence would exercise in the care of his own property of equal value?" were given to the jury at the request of the defendant and answered in the negative. And, the following interrogatory: "Do you believe that the defendant, under the particular circumstances in this case, exercised a less degree of care in keeping the property of the plaintiff than a person of ordinary prudence would exercise in the care of his own property of equal value?" was given for the defendant and answered in the affirmative.

Certain instructions were given, after which the jury brought in a verdict for the plaintiff in the sum of $1,073. There was a remittitur of $74 and a final judgment, for the plaintiff, for $999 and costs.

The law in this State is well set forth by Mr. Justice Magruder in *Gray v. Merriam,* 148 Ill. 179. In that case the court intimates that what is required of the bailee, is "the care usually and generally deemed necessary in the community for the security of similar property under like circumstances."

The things, which the plaintiff checked, were received to be taken care of. The club provided a room, a rack, checks and, supposedly, some one to take care of them until the check was presented and the things called for. No question as to the responsibilities of hotels and innkeepers is involved. Any one, club or otherwise, may become a bailee and as a result be responsible for some care. The club invited the bailment, held itself out ready to receive and take care of the things its members and guests presented. Whether or not the club did exercise appropriate care was a question of fact for the jury, under proper instructions. The night in question the wraps of about a thousand women were received by the club to be taken care of. There is no doubt they were collectively of great value and their possession by the club was a great responsibility. The garment deposited by the plaintiff alone was valued at over $1,000.

The evidence shows that early in the morning the woman—and she had been at work from six a. m. to three p. m. and from seven p. m. to three or four the next day—who had charge of the racks on the side where the plaintiff's things had been delivered was absent for three or four minutes. She says it was owing to some woman in the rest room screaming and seeming to need help. She also says that she asked one of the other girls to look after her cloaks. The plaintiff's things disappeared. When she presented her check, they were not found. What became of

them is not shown, and is probably not known.

Checking wearing apparel is a very general custom and its reason is both convenience and safety. And, when a guest delivers his hat or coat, or whatever it may be, to an attendant, and receives a check, there is impliedly a meeting of minds—there is perhaps in reality a meeting of minds—that it will be taken care of and set apart for that purpose. The plaintiff's things could not easily be lost or stolen without some one's obvious negligence. They may have been taken while the attendant was in the rest room and if they were and no one else was in charge of them meanwhile that would be the result of negligence.

Considering the evidence and the answers of the jury to the defendant's interrogatories, we do not feel justified in disturbing their verdict, unless there was some substantial error in the instructions.

It is contended on behalf of the defendant that it was error to give, on behalf of the plaintiff, the following instruction:

"You are instructed, as a matter of law, that where a bailor has shown that goods were received in good condition by the bailee from the bailor and were not returned to the bailor, on demand, the bailor has made out a case of prima facie negligence against the bailee. A bailee must show that the loss or damage, if any, was caused without his fault."

The criticism seems to be that the instruction did not state that after the plaintiff had made out a prima facie case of negligence it was *then* the obligation of the defendant to show that the loss was caused without its fault. We think the objection untenable. The use of the word "then" might have made the intended meaning of the instruction a little clearer, but we do not think its absence would mislead the jury.

It is further contended that it was error to give an instruction on behalf of the plaintiff which recited that after there was proof that the property had been put in the hands of the bailee and not returned upon de-

mand, "the law presumes negligence on the part of the bailee and imposes upon such a bailee the burden of showing that such bailee exercised such care in respect to the property as was required by him under the circumstances surrounding the bailment." The expression, of course, is somewhat indefinite; it does not define "care," still, it was entirely proper, as far as it went, as it certainly is the law that after the bailor has made out a prima facie case it then becomes the obligation of the bailee to introduce evidence to show that he exercised such care "as was required by the nature of the bailment." *Cumins v. Wood,* 44 Ill. 416.

It is further contended that it was error to refuse to give on behalf of the defendant instruction numbered six. Inasmuch, however, as instruction numbered five, which was given, and contained with more elaboration the substance of instruction numbered six, that contention is untenable. That part of instruction numbered six, which referred to a situation where the evidence was equally balanced, would have been misleading if given.

It is further contended that the court erred in refusing to give to the jury, at the defendant's request, instruction numbered seven, which contained the following:

"If you believe that the loss of these goods is a mystery, resulting from no known cause, and attributable to no negligence on the part of the defendant, then, in either of such cases, you must find the defendant not guilty."

That was inapt; the evidence did not justify it, as there was no mystery about it. The things were simply carried away by some one to whom they were given or stolen by some one, and in each of those situations there might be negligence.

It is further contended that the court erred in modifying instruction numbered eight which was tendered by counsel for the defendant. We do not think so;

the substance of that which was stricken out as a result of the modification had already been given in instruction numbered five. Taking the instructions altogether, we think they constitute a perfectly fair statement of the law, although it is true that, as counsel have suggested, in bailment cases such as this, confusion may easily arise owing to a failure to discriminate between the burden of proof which remains constant upon the one suing, and the burden of introducing evidence which may shift backwards and forwards.

As to the contention concerning the value of the things: The plaintiff stated that she bought the squirrel coat at Field's in October, 1920, and paid $1,050 for it. One Shayne, an employee of Field's who dealt in furs, testified that she knew the coat and that it was bought by the plaintiff for $1,050, and has been worth that amount ever since. There was no contradictory evidence. The plaintiff also testified that she checked with her fur coat two pairs of white kid gloves and a pair of boots; that the gloves were worth $15 and the boots $8. There was no other evidence. The verdict of the jury was for $1,073, but upon a remittitur of $74 being made by the plaintiff, the judgment was entered for $999. Under the circumstances, there being no evidence to the contrary, and no objection made to the testimony concerning the fur coat, and the judgment being less than the value testified to, the contention on the subject is untenable.

The judgment will, therefore, be affirmed.

*Affirmed.*

THOMSON, P. J., and O'CONNOR, J., concur.