(No. 20297.—

RUDOLPH LEDERER, Plaintiff in Error, *vs.* THE RAILWAY TERMINAL AND WAREHOUSE COMPANY, Defendant in Error.

*Opinion filed October 23, 1931—Rehearing denied Dec. 2, 1931.*

DEFREES, BUCKINGHAM, JONES & HOFFMAN, (DON KENNETH JONES, and WILFRED M. DOHERTY, of counsel,) for plaintiff in error.

TENNEY, HARDING, SHERMAN & ROGERS, and WINSTON, STRAWN & SHAW, (ROGER SHERMAN, HENRY F. TENNEY, and JOHN C. SLADE, of counsel,) for defendant in error.

Mr. COMMISSIONER PARTLOW reported this opinion:

Plaintiff in error, Rudolph Lederer, began suit in the circuit court of Cook county against defendant in error, the Railway Terminal and Warehouse Company, to recover damages for the loss of certain cases of whisky which were destroyed by fire. The declaration consisted of five counts. The first two were in bailment and set up the delivery of the whisky in good condition to defendant in error for safe keeping, the agreement to re-deliver the same on demand, the duty to exercise reasonable care for its safe storage, and its loss and destruction through defendant in error's negligence. The third and fourth counts charge specific negligence on the part of defendant in error in causing a sprinkler fire-protection system in its warehouse to be shut off, by reason of which the loss was incurred. The fifth count was in trover. Defendant in error filed the general issue and two special pleas denying the management, operation or control of the warehouse. The jury returned a verdict in favor of plaintiff in error for $56,234 and judg-

ment was entered on the verdict. On appeal to the Appellate Court the judgment was reversed, with a finding of fact that defendant in error was not guilty of any of the charges of negligence set out in the declaration. It was also held that the trial court should have directed a verdict in favor of defendant in error. The case comes to this court upon a writ of *certiorari.*

The sole question for review is whether the Appellate Court exceeded its authority in reversing the judgment with a finding of fact without remanding the case for a new trial.

The evidence shows that prior to 1919 plaintiff in error held distillers' certificates for a quantity of whisky upon which the internal revenue tax had not been paid and which was held in bond in warehouses, chiefly in Kentucky. In 1919 he delivered these certificates to Sigmund Weis for the purpose of having the whisky removed to Chicago. The transfer was made under Federal statutes and United States Treasury Department regulations, to the Wakem & McLaughlin General Bonded Warehouse, in Chicago. Weis paid all transportation and storage charges and billed plaintiff in error for the expense. In 1923 Weis arranged with defendant in error, which had a bonded concentration warehouse pursuant to law, for a transfer of a portion of the whisky of plaintiff in error from the Wakem & McLaughlin warehouse, which was to be discontinued by order of the Federal government, to the warehouse of defendant in error. This transfer was made in bond pursuant to government permits and under guard and control of government officers. Defendant in error issued warehouse receipts reading, "For the account of Sigmund Weis," but subsequently, on the direction of Weis, receipts were issued to plaintiff in error. During the time the whisky remained in the warehouse of defendant in error monthly storage bills were sent to plaintiff in error, who paid all storage charges in accordance with the contract between Weis and defendant in error.

The warehouse of defendant in error consisted of six floors and a basement, divided into three vertical sections, known as "A," "B" and "C," with heavy brick fire walls and fire doors in the openings between sections. The government bonded warehouse was on the top floor of section "C" and consisted of one large room about 150 feet long and about 90 feet wide. When the warehouse was established certain alterations were made to comply with government specifications. There was but one door to the warehouse. It was kept securely locked in accordance with the government regulations. A special government padlock was used for this purpose and the key was in the sole custody of the storekeeper. The whisky was held by the government for the payment of the government tax, and it was subject to withdrawal by the plaintiff in error only for the purposes provided by law. A wooden room about thirteen feet square was built on the east side of the warehouse and it was used as an office. A government storekeeper was assigned to the warehouse, which was operated in accordance with the provisions of the Federal statutes and regulations. Entry to the space was not permitted in the absence of the storekeeper, who was in attendance during all hours of the day and who possessed the only key to the lock. Employees of defendant in error, however, had ready access, in the presence of the government representative, at all times when the warehouse was open. The warehouse was equipped with a steam heating plant and a sprinkler fire-protection system. There were seven radiators in the warehouse but only the one in the office was in service. The engineer of defendant in error had instructed the government storekeeper to turn this radiator off whenever he left the warehouse. The sprinkler equipment was a wet-pipe automatic system and was uniform throughout the building. Alarms were connected with the equipment, consisting of attachments on the pipe valves wired to electric gongs in the building and to an annunciator in the engine

room. Immediately upon the release of water through a sprinkler head the gong sounded and the annunciator indicated the place where the sprinkler was operating. There were two hundred sprinkler heads in the warehouse containing fusible links, which melted at 165 degrees Fahrenheit and released a cap discharging at sixty pounds' pressure fifty to sixty gallons of water per minute.

Charles H. Roth, inspector for the Chicago Board of Underwriters, inspected the premises in December, 1924. He found certain portions of the sprinkler system shut off, and he told the engineer that the system should be put back in service or a dry-pipe system installed. He found in the office a wooden cuspidor filled with sawdust, and he called the attention of the government representative and defendant in error's engineer to this fire hazard. Patrick Falvey, manager for defendant in error, was in the warehouse at least once each day and he was there on the morning of January 31, 1925. He left the building about 2:00 o'clock that afternoon. About 1:30 he saw that the lock was on the door of the warehouse and the seal was in the lock. The government storekeeper's hours of duty were from 8:30 A. M. to 5:30 P. M., except Sundays and Saturday afternoons. Some time prior to the fire the engineer of defendant in error turned off the floor control valves of the sprinkler system in the warehouse and drained the system of water. The reason given for so doing was in order that the pipes would not freeze. The government weather reports and forecasts for two weeks prior to the fire showed low temperatures on several nights, some of which were near zero. Although the actual temperature on the day of the fire did not fall below thirty degrees, the government forecast showed a cold wave for the following day, which was Sunday, with a temperature near zero. About 5:00 o'clock in the afternoon of January 31, 1925, fire broke out in the warehouse. It was impossible to tell in what part of the warehouse the fire originated, although it ap-

parently started in the office. The fire broke through the floor below the warehouse at a point directly under the office, but it was extinguished by two sprinkler heads which operated on that floor. There was no damage to any part of the building other than the warehouse. The firemen connected their lines of hose but no water came through the sprinkler system. Lines of hose were taken up the stairway, and, after some delay in getting the locked door open, the fire was extinguished. Fire inspectors made an inspection immediately following the fire. They found that the floor valves controlling the sprinklers in the warehouse had been turned off and the system drained of water. The wheel on the stem of one of the valves had been entirely removed. An examination made two days later by inspector Roth and by the engineer of defendant in error showed that the floor control valves for several rows of sprinkler heads were closed. The links had fused in the sprinkler heads but the caps remained in position, there being no water pressure. The engineer told Roth that he had orders to close the valves in order to prevent the sprinkler heads and piping from freezing and that he had closed them two weeks previous to the fire.

In a case tried by a jury where the evidence of the plaintiff tends to establish a cause of action the Appellate Court is not authorized to reverse the judgment with a finding of fact and not remand the case. (*Mirich* v. *Forschner Contracting Co.* 312 Ill. 343.) Where a bailor proves he has stored goods in good condition with a bailee and they are returned to him damaged or not returned at all, the law presumes negligence on the part of the bailee unless he shows the loss did not result from his negligence. (*Byalos* v. *Matheson,* 328 Ill. 269; *Miles* v. *International Hotel Co.* 289 id. 320.) If the evidence in support of the plaintiff's allegations is sufficient to make a *prima facie* case, the trial court is not authorized to direct a verdict for the defendant because of evidence of contrary facts

tending to an opposite conclusion. (*Shannon* v. *Nightingale*, 321 Ill. 168.) If the relation of bailor and bailee existed between plaintiff in error and defendant in error at the time of the damage complained of, plaintiff in error made out a *prima facie* case of negligence and the Appellate Court erred in reversing the judgment with a finding of fact without remanding the case.

Defendant in error operated a general bonded warehouse under Federal statutes and regulations. When the statutory provision for concentration warehouses was passed in 1922 defendant in error made application, gave bond, and obtained a permit authorizing it, as proprietor, to maintain and operate such a warehouse. Under section 911 of Internal Revenue Regulation 60, defendant in error, as proprietor, was authorized to maintain and operate a warehouse in accordance with the regulations and to sell liquors owned by other persons and stored in its warehouse, either under bond or tax paid, upon written authorization by the owner. Defendant in error was required to give a bond to operate the concentration warehouse (Int. Rev. Reg. 60, art. 9, sec. 921,) in addition to the bond to operate a general bonded warehouse. (U. S. C. A. title 26, sec. 393; Int. Rev. Reg. 20, art. 5.) Defendant in error was under obligations to maintain and keep its warehouse safe and secure for the storage of goods deposited therein. It sent monthly storage bills to plaintiff in error, all of which were paid. It was lawfully operating a business for remuneration under government supervision. A valid and binding contract was entered into between the parties to this suit and the bailment relationship was complete.

Counsel for defendant in error insist that the government had exclusive custody and control of all whisky on deposit in the warehouse. The statute and regulations governing general bonded warehouses provide that such warehouses shall be in the joint custody of the government storekeeper and the proprietor. (U. S. C. A. title 26,

sec. 393; Int. Rev. Reg. 20, art. 15.) Counsel cite *Taney* v. *Penn Nat. Bank,* 232 U. S. 174, in support of their contention. It was held in that case that a pledge of a warehouse certificate for whisky stored in a distiller's bonded warehouse, made in good faith more than four months prior to bankruptcy, was good as against a trustee in bankruptcy and the claim of general creditors, notwithstanding there had been no delivery of the whisky itself. The statement in the opinion that the control of the government representative is made dominant notwithstanding the statutory provision that every distillery warehouse shall be in the joint custody of the storekeeper and the proprietor thereof does not relieve the proprietor of his duty to exercise ordinary care toward property jointly in the custody of himself and the government. While the control of the whisky was dominantly in the government, yet by the laws of the United States and the regulations of the Treasury Department the custody was shared with the proprietor. Where Federal statutes and regulations provide that bonded warehouses shall be in the joint custody of the government officials and the proprietors, the cases hold that the bailment relationship exists between the owner of the goods stored and the proprietor. (*Schwartz* v. *Michigan Warehouse Co.* 219 Mich. 401, 189 N. W. 1; *Schwerin* v. *McKie,* 51 N. Y. 180, 10 Am. Rep. 581.) The officers and employees of defendant in error were given access to the warehouse by the government storekeeper in charge whenever it was necessary to do so. The only times the owner did not have access was when the storekeeper was absent and the warehouse was locked.

A bailment relationship existed between plaintiff in error and defendant in error. Defendant in error exercised its right to maintain the warehouse and exercised acts of ownership over it when it shut off the steam in the warehouse and made an agreement with the storekeeper to shut off the radiator in his office whenever he left the

building. It exercised jurisdiction over the warehouse when it shut the water off of the sprinkler system without any other provision being made for fire protection. Defendant in error knew what obligations it assumed under the statutes of the United States when its building became a bonded warehouse. The whisky was deposited by virtue of Federal statutes and regulations and by virtue of an agreement between plaintiff in error and defendant in error. Plaintiff in error had no access to the warehouse and was in no position to know what caused the fire. The whisky was deposited with defendant in error in good condition and was damaged while in its possession. This proof made a *prima facie* case under the first and second counts of the declaration.

The third and fourth counts were based upon specific negligence of defendant in error in shutting off the water in the sprinkler system. At the time this building was designated as a government warehouse there were seven radiators in the warehouse. There was a sprinkler system throughout the building. Plaintiff in error canceled his insurance on the goods stored when they were placed in this warehouse. Why this was done does not appear from the evidence unless it was that he relied upon the sprinkler system. Defendant in error of its own motion caused the sprinkler system and six of the radiators to be shut off entirely. It contends that it shut off the sprinkler system for the reason that there was danger of the water in the system freezing and the pipes bursting, flooding the room with water. Whether it was justified in shutting the heat off in this building and shutting off the water from the sprinkler system was a question of fact for the jury. There was evidence fairly tending to support the charges in the third and fourth counts of the declaration.

The trial court was without authority to direct a verdict on the first four counts and the Appellate Court was

without authority to reverse the judgment without remanding the case for a new trial.

The judgment will be reversed and the cause remanded, with directions to the Appellate Court to either affirm the judgment or to reverse the judgment and remand the cause to the trial court for a new trial.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.
*Reversed and remanded, with directions.*