Honorine Henderick, Appellee, v. Uptown Safe Deposit
Company, an Illinois Corporation, Appellant.

Gen. No. 47,547.

First District, Third Division.

April 22, 1959.

Rehearing denied June 22, 1959.

Released for publication June 22, 1959.

Ernest A. Eklund and John N. Thornburn, of Chicago, for appellant.

Clarence M. Dunagan and Harry George, of Chicago, for appellee.

PRESIDING JUSTICE FRIEND delivered the opinion of the court.

Plaintiff, who had rented a safe deposit box in the vault of defendant, Uptown Safe Deposit Company, a corporation, brought suit to recover damages for the alleged failure of defendant to keep safe $37,750 in cash alleged to have been placed in the box and to have disappeared. Trial by the court and jury resulted in a verdict for the amount claimed, and after the denial of post-trial motions, judgment was entered on the verdict, from which defendant appeals.

The complaint, as amended, alleges that the funds were not lost or misplaced by plaintiff but, through the carelessness and negligence of defendant in the maintenance and protection of her property, disappeared from the box leased for her use. Defendant's answer denied carelessness and negligence and, by way of affirmative defense, averred that it exercised the ordinary care and diligence required of a bailee in the preservation of any and all deposited property by plaintiff when the box was in the exclusive control of defendant and not in the use of plaintiff or the corenters.

 It is agreed that the relation between the parties was that of bailor and bailee. Within this relation, the depositary for hire was bound to exercise ordinary care and diligence in the preservation of plaintiff's property. Ordinary care in such cases has been defined to be such care as prudent men take of their own property; and ordinary diligence, as men of common prudence usually exercise about their own affairs. Bauman v. National Safe Deposit Co., 124 Ill. App. 419; Mayer v. Brensinger, 180 Ill. 110; National Safe Deposit Co. v. Stead, 250 Ill. 584. The duty of

exercising such care arises from the nature of the business which the safe deposit company carries on. The obligation to discharge such duty is implied from the relation between the parties. National Safe Deposit Co. v. Stead, 250 Ill. 584. However, defendant was not an insurer of the safety of the contents of plaintiff's deposit box. Hauck v. First Nat. Bank of Highland Park, 323 Ill. App. 300. It is fundamental that in an action based on negligence the plaintiff must not only allege but also prove actionable negligence; and while plaintiff is entitled to the most favorable inferences that can be drawn from the evidence, nevertheless, in a case of this kind, there must be some competent evidence that the money had been taken from the box without the knowledge or consent of plaintiff and the corenters, by reason of defendant's failure to exercise ordinary care in safeguarding her property.

From evidence adduced upon the hearing, as set out in a record of almost 500 pages, it appears that plaintiff was about eighty years old at the time of trial and had been a resident of Chicago since 1893. For about thirty years she and her husband Edemond had been engaged in the business of renting furnished apartments and sleeping rooms. In November 1951 they rented jointly box No. C786 in defendant's vault, in which they deposited, from time to time, cash proceeds from the income of their business enterprise. In August 1953 plaintiff was advised that her husband was incurably ill, and for that reason she wished to have his name taken off their box. Accordingly, on the fifteenth of that month she communicated her wishes to the officers of the safe deposit company, and, because her husband was too ill to accompany her to the vault and sign a surrender card, she was advised, in order to effectuate the change immediately, to surrender the jointly-held box and take out another box in her own name. In accordance with that

advice, box No. 13 414 was assigned to her as the sole renter. She took both boxes to a booth in the vault, removed all the contents from the jointly-held box and transferred them to the newly assigned box held in her name only. She testified that at the time of this transfer she had cash accumulations in the safe deposit box of something over $89,000. Her husband died September 23, 1953, and shortly thereafter, on October fourteenth, her son Joseph Henderick and her daughter Helen Gehrke went to the office of the safe deposit company to sign a contract making them co-tenants of box No. 13 414. A week later on October 21, 1953, plaintiff and her daughter took the box to a booth and found in it $51,650, an amount which represented a loss, so they contended, of $37,750. In testifying as to the amount of $51,650 plaintiff consulted a memorandum on which her daughter had written that amount and which plaintiff took to the witness stand with her because, as she explained, she couldn't "remember so good any more."

Plaintiff had savings accounts totaling in excess of $40,000 and placed in five banks. Her business was conducted on a cash basis, and whenever she had more cash at home than she thought prudent, she deposited it in her safe deposit box. Evidently it was her practice to put cash in her box and then take it out from time to time to purchase bonds, generally at the Uptown National Bank. She once testified that she and Mr. Henderick counted the money in August 1953; later she stated that she could not remember when they counted it. From the record it appears that on October 21, 1953 she purchased at Uptown National Bank government bonds in the amount of $5250, $5250, and $20,000 (cost price), in which she, or she and her son or daughter, were named as owners. In the aggregate they represent a cost value of $30,500, a sum not a great deal less than the $37,750 for which plaintiff is suing. Previously, on December 24, 1952

she had purchased a government bond in the amount of $3000 in her husband's name; on March 11, 1953 she had purchased a $525 government bond in her own name; on March 12, 1953 she had purchased a $3000 government bond, and on April 23, 1953 a $6000 government bond, both bonds in the name of herself and her husband. All these bonds were purchased at the Uptown National Bank; from the first purchase recorded here, on December 24, 1952, to the last, on October 21, 1953, her cost price investment in government bonds totaled $43,025, a total, one may note, not greatly in excess of the $37,750 for which plaintiff is suing. In February of 1954 she purchased a government bond in the amount of $11,625 at the First National Bank in Chicago.

Plaintiff and her daughter testified that there was but $51,650 in the box on Wednesday, October 21, 1953, when plaintiff opened it at 11:00 a.m. Plaintiff estimated, as she testified, that $37,750 was missing, and immediately reported the alleged loss to the vault authorities.

The quarters of the Uptown Safe Deposit Company, which is a wholly owned subsidiary of the Uptown National Bank of Chicago, are in the building located at the southeast corner of Lawrence and Broadway. The safe deposit vault is in the basement and does not touch the outside wall of the building. At the front entrance to the vault, on the south side, there is a lobby, accessible by stairway or elevator, from the street level lobby. The banking quarters, located on the second floor of the building, have private passages from the tellers' cages on the south side which connect with a private elevator or stairway providing direct access to the vault; on the basement level, the stairway and elevator open into a service lobby which connects, on the east, with the vault lobby. The business office of the safe deposit company, in which are kept the card indices containing the names and box

numbers of the renters, is located to the south of the vault lobby and is separated by a customers' counter where a device is kept which stamps on each box holders' admission ticket the year, month, day, hour and minute of every entry to the box; the renter is required to affix his signature to the admission ticket whenever entering the vault.

The safe deposit vault is made of reinforced concrete, sixteen to eighteen inches thick. There are two vault doors, one leading from the vault proper to the vault lobby, the other leading out the west side of the vault to the customers' booth lobby, which has a line of customers' booths on either side. The front door is about eighteen inches thick, made of steel, and has twenty-four locking bolts. The side door is also steel, twelve to fourteen inches thick, and likewise has twenty-four locking bolts. Each door has two combination locks. The front door has a four-movement time clock, while the side door has a three-movement time clock. Both doors are of approved standard and grade. The customers' booth lobby "dead-ends" at the north and during business hours is barred at the south by a locked gate made of metal grillwork. During business hours both vault doors remain open; the one at the south end of the vault leading to the lobby is barred by a locked day gate made of metal grillwork. A buzzer controlled by an employee in the business office admits a renter into the vault after he has signed an admission ticket and been properly identified.

The vault contains some 14,000 safe deposit boxes. The section containing plaintiff's box was acquired as a new unit from Diebold, Inc., and installed in November 1947. Plaintiff's box had been rented only once before—to Herbert P. Bennet, a pharmacist, and Edna, his wife. Two keys are issued to each holder of a renter's box. None of the boxes can be opened without the use of one of these keys, together with the guard

521

key; the box holder's key cannot be inserted to become operative until the guard key is inserted and turned. The guard keys are in the personal possession of the vault custodians on duty at all times, except while the vault is closed between the end of one business day and beginning of another; at such times they are locked inside the vault. The keys to the unrented boxes are kept locked in one of the boxes under the control of Mr. McCabe and Mr. Kradwell, employees of defendant. The lock and key of any box surrendered by a box holder are thereupon changed. When the lock is taken off the box, the numbers on the keys are eradicated. The lock, with the keys, is put into stock; then a lock which has been in stock is taken out, put on the door, and the number corresponding with the box number is put on the keys with a die and hammer. This would not be done for some weeks, or possibly some months, after the lock had been taken off another door; in the interim, the keys would have no number. Since no record was kept of the door from which the lock was taken, no one would know where the lock was before it was put on the new number, and the keys numbered accordingly. The care and installation of the locks on the cubicle doors was in charge of Adolph Hodel, a locksmith who worked for Herring-Hall-Marvin Safe Company, York Safe Company, and Diebold, Inc., and who is now doing independent contracting work of the same nature for the First National Bank, City National Bank, and Continental Illinois National Bank, all of Chicago. He was the only locksmith who worked at the Uptown Safe Deposit Company during the year 1953. The two keys furnished plaintiff by defendant are Diebold keys supplied with the boxes by the manufacturer and marked with the name Diebold to indicate the manufacturer. In the event a renter loses one of his two keys, a new key, in duplicate form, is made on a lathe

or grinder, and the blank keys are counted out and accounted for by the locksmith.

· There is a guard on duty at the vault from the time it is closed until it is opened on the next business day. Two American District Telegraph pull boxes or checks are on the outside of the vault, one on the east wall, the other on the north wall. The guard is required to pull or turn the check at least once every hour; if he misses a call the American District Telegraph Company, which has offices in the same building, immediately investigates to determine why the call was not made. The time lock on the front vault door is set at the close of each business day—1:00 p.m. on Wednesdays, 4:00 p.m. on the other business days of the week; it is then checked by one of the officers of the safe deposit company, after which the door is closed and locked. Either Mr. McCabe or Mr. Kradwell remains inside the vault until the bank tellers have all their trucks in; then the time locks on the side door are set, and the door closed and locked in the same manner as the front door. These doors cannot be opened until the morning of the next business day, and then only by designated officers having the combinations. Two officers of the safe deposit company and four officers of the bank know one of the combinations of each of the two doors to the vault; the other combination on each door is known to the other officers of the bank, but no one individual knows the two combinations on one door or the other.

All the funds and securities of the Uptown National Bank are kept in defendant's vault, except that such amounts as are needed for the day's banking transactions are taken upstairs in the morning and not returned to the vault until the close of the business day. The reserve cash, averaging over $300,000, is kept in a large safe deposit box, while some of the securities are placed in boxes similar to plaintiff's. The vault

also contains fourteen or more tellers' safes, in the rear of the vault area and apart from the renters' boxes, into which the tellers' trucks are wheeled after the close of business, and in which funds used during the business day are kept outside of banking hours. The vault area used by the bank is separated from the renters' boxes by an ordinary door. The tellers balance daily. The signatures of two bank officers are required to gain access to any of the deposit boxes used by the bank.

Whenever a box holder desires entry to his box, he is required to sign an entrance ticket pertaining to his box. This he presents to the counterman at the business office who checks the signature, and if it is found to be that of the renter, the ticket is initialed and time-stamped. The counterman then admits the renter to the vault by releasing the lock on the day gate at the front vault door by means of a buzzer. He is met by a custodian who examines the ticket; if it is found in proper order the custodian, using the customer's key and his own guard key, unlocks the cubicle in which the box is locked.

If a box holder takes his box to one of the booths in the booth lobby, the door of the cubicle is opened and the custodian gives him back the key with the box. The door to the booth locks behind the customer after he has entered, and when he comes out the booth door automatically locks again. The custodian then examines the booth to ascertain if anything has been left there; any articles found are turned over to the manager and returned to the owner if he can be traced. The vault is cleaned daily by a maintenance man in the presence of the manager or a custodian. The vault mechanism is inspected every two months by Diebold, Inc. It appears that during the past eighteen years no burglaries or hold-ups have occurred. Renters at times have complained that items were missing, but subsequently they were always found some place oth-

er than the vault area; never has there been any actual loss on defendant's premises. In the present case there was no mark on the face of the door of the cubicle which showed any tampering; the original lacquer was still on it.

The evidence discloses that the safe deposit company used care in the selection of its employees. With one exception, all the employees had satisfactorily passed lie-detector tests and had been recommended for their positions by crime-detection laboratories. Miss Dalk, the sole exception, had been recommended by Mr. Wuehrmann, president of the Uptown National Bank at the time she was employed.

W. R. Davis, president of the Howard Safe Deposit Company, located at 1737 Howard Street, Chicago, testified in detail as to the operation of his company. It is affiliated with the North Shore National Bank and has quarters on the same floor. From his testimony it appears that the Howard Safe Deposit Company operated in substantially the same manner as the defendant deposit company here.

■■■■■ We have carefully examined the decisions cited by the respective parties. In most cases on bailments the question of burden of proof is paramount. If plaintiff has sufficiently proved a case of *prima facie* negligence against defendant or, as some courts put it, has created a presumption of negligence, then the burden of proceeding with the evidence shifts to the defendant. However, this presumption is not evidence; rather, it relates only to a rule of law as to which party shall go forward and produce evidence sustaining the matter at issue. A presumption will serve as, and in the place of, evidence in favor of one party or the other until *prima facie* evidence has been adduced by the opposite party, but the presumption should never be placed in the scale to be weighed as evidence. 10 Ruling Case Law, Evidence, sec. 44; 20 American Jurisprudence, Evidence, sec. 166; Wigmore

on Evidence, vol. 9, sec. 2508. Although there is some difference in viewpoint evident in the decisions, the principle now seems to be well established that the burden of proof never shifts. In Roberts v. Minier, 240 Ill. App. 518, where plaintiff brought suit to recover the value of bonds alleged to have been stolen when defendant's safe deposit vault was entered by thieves, the court said: "Defendant did not hazard his case upon a failure of plaintiff to make a case. He put in evidence which at least tends to rebut every wrongful and negligent act charged against him. We held, when the case was formerly here, that to meet the plaintiff's case it was necessary as matter of probative value of the evidence to equal or overcome it. But we did not by that mean to hold that the burden of proof rested at any time with defendant, or shifted from the plaintiff to the defendant as counsel seems to think. As Thayer says, after his usual thorough and discriminating discussion of this subject: 'We see that the burden of going forward with the evidence may shift often from side to side; while the duty of establishing his proposition is always with the *actor* and never shifts.' (Preliminary Treatise on Evidence, 378.) See 1 Greenleaf on Evidence, page 105 (16th ed. Wigmore). This doctrine is applied in Donovan v. St. Joseph's Home, 295 Ill. 125; Miles v. International Hotel Co., 289 Ill. 320; Kokzura [Koczora] v. Standard Safe Deposit Co., 221 Ill. App. 43, 49." See also Hollingshead Motors Co. v. Crogan, 336 Ill. App. 423.

In cases cited by plaintiff it appears that the receipt of the bailed article was either admitted or established by a fair degree of proof, as in Oscar Heyman & Bros., Inc. v. Marshall Field & Co., 301 Ill. App. 340, where a diamond brooch was admittedly received by the bailee and discovered missing from the value room; in Brenton v. Sloan's United Storage & Van Co., 315 Ill. App. 278, where the bailed articles were furniture admittedly received; in Byalos v. Matheson,

328 Ill. 269, where there was no question of plaintiff's having delivered the bailed automobile to bailee; in Dunne v. South Shore Country Club, 230 Ill. App. 11, where there was no question of the delivery of a fur coat to the checkroom; and in Chicago German Hod Carriers Union v. Security Trust & Deposit Co., 315 Ill. 204, where officers of plaintiff had counted the cash contents of the box more than once, and with the aid of their account books were able to establish a fair degree of proof as to how much cash was in the box before thieves broke in and absconded with the contents. In these cases the delivery and identity of the bailed property having either been admitted or proved, the burden of showing ordinary care in safeguarding the bailed goods was cast on defendants. In Lederer v. Railway Terminal & Warehouse Co., 346 Ill. 140, the amount and value of bailed whiskey was undisputed, and the evidence showed that defendant had caused the sprinkler system to be shut off entirely. On certiorari to the State Supreme Court the judgment of the Appellate Court holding in favor of defendant bailee was reversed and the cause remanded with directions to the Appellate Court to either affirm the judgment of the trial court in favor of plaintiff bailor or to reverse the judgment and remand the cause to the trial court for a new trial.

Plaintiff also relies on cases where some degree of negligence was established by the bailor, as in Saddler v. National Bank of Bloomington, 403 Ill. 218, where the wife of the lessee of the box, obtaining the key, was permitted by the vault authorities, without the consent of the lessee, to enter his box, while he was away in the armed services, and take his property from it; in Kammerer v. Graymont Hotel Corp., 337 Ill. App. 434, where (as appears from the briefs, although the evidence is not set out in the opinion proper) it was shown that a master key was temporarily missing; and in Mayer v. Brensinger, 180 Ill.

110, where plaintiff showed that he had deposited in his safe deposit box money which had come into his hands as the result of distribution of the residue of an estate, and where an employee of the owner of the safe deposit vault, although knowing the depositor was then in a detention hospital (with a mental illness), permitted two strangers to have access to his box without identification, except that they had the key and power of attorney purporting to be signed by the depositor.

Miles v. International Hotel Co., 289 Ill. 320, a bailment case, contains a good statement of the guidelines to be followed: "The weight of modern authority holds the rule to be that where the bailor has shown that the goods were received in good condition by the bailee and were not returned to the bailor on demand the bailor has made out a case of *prima facie* negligence against the bailee, and the bailee must show that the loss or damage was caused without his fault. (Cumins v. Wood, 44 Ill. 416; Schaefer v. Safety Deposit Co. supra [281 Ill. 43].) The effect of this rule is, not to shift the burden of proof from plaintiff to the defendant but simply the burden of proceeding. . . . Plaintiff in error had the burden of showing what property she delivered to defendant in error and the value of this property. After she established her *prima facie* case, then the duty of defendant in error was to show that it was not negligent in keeping this property, if it was ever intrusted to its care." Mere proof of loss, however, will not make a *prima facie* case. Roberts v. Minier, 240 Ill. App. 518, citing numerous decisions in this State and elsewhere, also presents a full and logical discussion of the rule.

There is, in the instant case, nothing more than plaintiff's testimony, supported by that of her daughter (who had to depend on her mother's assessment of the amount), that $37,750 in cash was missing from

her safe deposit box. Plaintiff, a woman about eighty at the time of the trial, commented herself that she couldn't "remember so good any more"; moreover, she did not employ a methodical system—perhaps it would be more accurate to say that she did not employ a system at all—in keeping a record of her cash deposits in the box. There is no evidence that the money claimed to be missing had been taken from the safe deposit box without the knowledge or consent of plaintiff or one of the corenters. From the facts concerning the operation of the vault, plaintiff attempts to deduce the theory that one or more of the bank tellers, after checking their accounts at the close of the banking day and delivering the proceeds by truck to the vault area, may have surreptitiously gained access to plaintiff's box through some unexplained means and taken from it the cash alleged to be missing. There is no evidence that any of the tellers ever entered the area of the vault where customers' safe deposit boxes were located, or that they could have gained access to plaintiff's box if they had entered that area. After the front door of the vault was locked, a guard or custodian always remained in the customers' area until all the funds from the tellers' trucks had been deposited in the bank's vault boxes, and the side door of the vault area was never closed nor the time lock set until this operation was completed and all the tellers had left. Plaintiff's theory is purely speculative, conjectural and without evidentiary support. One would, indeed, be forced to Procrustean efforts to conform plaintiff's evidence to the proof required in a case of bailment.

In Shoeman v. Temple Safety Deposit Vaults, 189 Ill. App. 316, a case similar on the facts, Mr. Justice McSurely, in discussing plaintiff's theory (there also advanced without evidentiary support) that a dishonest employee might have surreptitiously obtained

keys to a safe deposit box and removed the contents, pertinently observed that "While this is an ingenious and in some respects a plausible theory, it does not attain to the dignity of proof. There is no direct evidence that any employee took the money from the box"; and after stating that plaintiff's theory could not be accepted without indulging in one presumption based upon another presumption, continued: "The defendant was not obliged to prove a condition of perfect safety in the management of the vault, and certainly not a condition beyond any possible speculative theory of insecurity. The case should not have gone to the jury upon the theory that unless the defendant proved its deposit boxes to be absolutely impregnable it would be held negligent. As we have said, the defendant was bound to use only ordinary care, and the evidence shows beyond any question that such a degree of care was exercised."

■ Without further reviewing the numerous authorities in this State and elsewhere cited by the respective parties, it may be said that those cases involved facts showing that if those in charge of the boxes had exercised ordinary care, the bailees would not have been liable for the losses. The principle underlying all the cases to which our attention has been called and in which the plaintiff prevailed is that the receipt of the bailed article was admitted or established by a fair degree of proof, and that the loss was occasioned through the imprudent operation of agents or agencies under the control of the bailee. See Mayer v. Brensinger, 180 Ill. 110. After a careful consideration of the evidence in the instant case and the law applicable thereto, we have reached the conclusion that plaintiff did not prove negligence as charged, and that the case should not have been submitted to the jury.

Moreover, defendant's proof showed without contradiction that every reasonable precaution was employed to safeguard the property of its renters. Its employees were carefully selected, access to its vault was carefully supervised, its box keys were meticulously accounted for. Defendant was bound to use only ordinary care, and the evidence shows beyond question that such a degree of care was exercised. It would be a dangerous doctrine and an invitation to fraud to allow a renter to recover upon the mere statement that cash or securities were found missing from his box, or had in some unknown way disappeared, without requiring a fair degree of proof of negligence on the part of a safe deposit company.

For the reasons indicated, we think that the court should have directed a verdict in favor of defendant at the close of plaintiff's case, or, in any event, have allowed defendant's motion for judgment notwithstanding the verdict. Accordingly, the judgment of the Circuit Court is reversed, and the cause remanded with directions that judgment be entered in favor of defendant, notwithstanding the verdict.

Judgment reversed and cause remanded with directions.

BRYANT and BURKE, JJ., concur.