No. 20984.

PHILIP CASH *v.* MINNEQUA BANK OF PUEBLO, A CORPORATION.
(426 P.2d 767)

Decided March 27, 1967.     Rehearing denied May 15, 1967.

237

BELLINGER, FARICY & TURSI, for plaintiff in error.

SEAVY & SEAVY, H. MYERS BUMGARDNER, for defendant in error.

*En Banc.*

Opinion by ROBERT B. LEE.*

PLAINTIFF in error, Philip Cash, is hereinafter called Cash, and the defendant in error, Minnequa Bank of Pueblo, will be referred to as the bank.

Cash brought suit against the bank, alleging that it "* * * so negligently safeguarded its said safety deposit box number 18 that, without the knowledge or consent of plaintiff, money and property belonging to plaintiff

---

*District Judge sitting under assignment by the Chief Justice under provisions of Article VI, Section 5(3) of the constitution of Colorado.

and reasonabl*e* (sic) worth $7,685 disappeared therefrom * * * ."

The jury awarded Cash that sum. The bank filed a motion for a new trial which was granted. All of this occurred prior to the June 1, 1964 amendment to R.C.P. Colo. 59(g), and Cash therefore elected not to participate in the new trial. The court then, on the record established by the parties in the first trial, dismissed Cash's claim and entered judgment for the bank.

We are now called upon to determine whether the trial court erred in entering the judgment in favor of the bank, or, whether a judgment should be entered on the jury verdict rendered in the first trial.

The events out of which Cash's claim against the bank arose are summarized as follows:

Cash and his wife Rose rented a safe deposit box from the bank on Nevember 13, 1951. The box was physically located in a nest of 120 boxes on the lower right side of the safe deposit vault as one enters the vault. These 120 boxes were numbered respectively 1 to 120 and were designated as the "B" section of boxes.

Located at the upper left of the vault was another nest of twenty-six boxes, numbered 1 to 26, and designated by the bank as the "A" section of boxes. In the "A" section was a box also numbered 18. This box was sometimes designated in the bank records as Box 18 and sometimes as Box 18-A. The total number of boxes in the vault was approximately 1000.

The bank records, as they relate to the particular box which Cash claims to have used, and for which he paid rent, were not uniform. They show, for example, that the original 1951 safe deposit signature card referred to Box 18; the original safe deposit register card, however, referred to both Box 18 and 18-B. Concerning the "record of visits" by Cash — twelve in number — ten entrance tickets from November 28, 1951 to April 10, 1954 refer to Box 18, and two box visits were noted with no box number designated thereon. During the same period

some box rent receipts refer to Box 18 and others to Box 18-B. There was also one bank record which referred to Cash's box as Box 18-A, the "A" appearing to have been handwritten in red pencil and then erased.

Despite the confusion in the bank's records, the evidence is undisputed and stands admitted by Cash that the box he refers to in his claim was at all times the one numbered 18, located in the "B" section; and this irrespective of its designation on the records and cards. Cash admitted that the Box 18 he always entered was on the lower right hand side as he walked into the vault. He made no claim concerning the box numbered 18 which was physically located in the "A" section on the left and considerably higher up; and he further does not dispute that at all times pertinent, the other Box 18 was rented to third persons not involved in this dispute.

Further undisputed evidence showed that the safe deposit box could only be opened by the simultaneous use of two different keys. The bank held one — the master or guard key — and the customer held the other, a specific box key which was issued in duplicate. In order to open a box the bank key and the customer key was required at all times. If the latter key was not produced, no other master key or passkey could open it; and for a locksmith to open it, it was necessary to drill the lock, thereby destroying it.

Events subsequent to July 29, 1954 are also important to an understanding of the questions involved herein. The testimony of certain bank employees, supported by bank records, show that Cash signed as having entered the box on July 29, 1954, and that he at that time surrendered possession of the box to the bank. One key only was turned in by Cash according to the bank records. Because of the one key still outstanding, the lock on the box rented to Cash (there is no dispute this is the box involved) was removed and taken to a locksmith, where the tumblers or combination was changed. Two new keys were then made which fitted

the new combination, and the one old key turned in by Cash was destroyed.

The lock with the new combination and the new keys were returned to the bank, and the lock was re-installed in the box. This was shown to be the practice in order to protect subsequent users of boxes previously in use. The box was rented to Helen and Tony Piastro on August 27, 1954. These matters were supported by the testimony of the vault attendant, the bank cashier in charge of the safe deposit boxes, the locksmith who worked on the lock, and the Piastros.

The undisputed evidence further showed that in June, 1954, a new system of safe deposit entrance cards was put into operation and a time clock was also installed. Under the new system, upon request for entry, a new combination signature, ledger and entry card, containing thereon the renter's signature for identification purposes, would be signed by the renter seeking entrance; it would then be stamped by the time clock with the date and hour of entry. This combination record card also served to record payment of box rentals.

In the changeover from the old to the new system, new cards were prepared for safety deposit box customers in alphabetical order, including one made out in Cash's name. Significantly, this new card was never signed on the "authorized signature line" by either Cash or his wife. Furthermore, the card was not cancelled at the time the record shows the surrender to the bank, and the bank continued to obtain rent for the box in question by debiting the amount from Cash's checking account, all of which is admitted by Cash. The new entrance card for Cash shows no entry by him or his wife into the box at any time during the period from July, 1954, to January 5, 1960. There is one entry on the new card, dated January 21, at 11:25 A.M., followed by Cash's signature. Underneath this entry is a handwritten endorsement "1-21-59, did not enter box. Reported keys lost. R. L. Freeman."

Freeman, the cashier of the bank in charge of the vault at that time, testified that he personally handled the transaction with Cash on that day and made the notation on the card to record the fact that Cash had reported his key lost, and that no entry was made into the box at that time.

Cash testified that he entered the box several times in the four and one half years, the period from July, 1954, to January, 1959, and that he did enter the box on January 21, 1959, the entrance record and Mr. Freeman's notation notwithstanding. There is other evidence, not disputed, however, that the box claimed to have been entered by Cash "several times" during the period was, in fact, the same box used by Helen Piastro with the key issued to her and made for the new lock as above related. The combination signature, ledger and entry card shows the identification signatures of both the Piastros. The card shows thirteen entries into the box by Helen Piastro, from September 15, 1954 until January 7, 1960. Mrs. Piastro testified that at no time during this period were there any contents in their box other than those belonging to her and her husband, all of which she identified when the box was drilled as will be related later.

It is out of this background setting that Cash predicates his claim against the bank. He testified that on January 19, 1959 he borrowed $7500 from one Pete Pisciotta and executed a promissory note as evidence of the debt. The purported purpose of the loan was to take up a real estate purchase option. The proceeds of the loan were received in currency of large denominations consisting of 20, 50 and 100 dollar bills. Cash testified that two days later, on January 21, 1959, he took this currency to the bank and requested entry into the safe deposit box. He testified that he gave his key to the girl in attendance (whom he did not know, never saw before, and had not seen since), saw his card stamped, signed the card, told the girl he didn't

have to take the box out into the lobby but just wanted to deposit the money in the box, which was then put back in its place in the vault, and that he then left the bank. He claimed that at the time he deposited the money there the box contained the following items: a man's diamond ring worth $185; a lady's diamond ring and wedding band; some insurance papers and lease papers. This was the same date, January 21, 1959, the entry record and Freeman's notation and testimony show that Cash reported his key lost and that no entry was made into the box.

Cash testified that in July, 1959, he discovered that he and his wife had lost their keys to the box (one had already been turned in and destroyed). He notified the bank and was advised that the box would have to be drilled and that he should search further. This he claims he did, to no avail. He stated that on January 5, 1960 the box was drilled open. The contents which Cash claimed to have put in the box were not there, but other items which did not belong to Cash were found in the box. Subsequently, Mrs. Piastro was summoned to the bank and identified the contents of the box as hers.

The bank admitted the mistake in its records as to the collection of rental and offered to refund to Cash the rent collected by it from November 14, 1954 to December 29, 1959. Cash refused to accept it.

The bank's motion for a new trial set forth seventeen grounds of alleged error, among which were that the verdict was contrary to and not supported by the evidence, and that erroneous instructions were given to the jury. After extended consideration, the trial court sustained the bank's motion and granted a new trial upon the following two grounds:

"3.

"Neither negligence nor carelessness, unless the proximate cause of a loss or injury, is the basis of recovery. While the Court feels that the operation of the bank was negligent and careless and left much to be desired,

it is unable to attribute the loss, if a loss occurred, of plaintiff thereto and does not believe that any negligence or carelessness on the part of the defendant, which could reasonably and properly be said to have proximately caused the claimed loss, was shown.

"4.

"The Court recognizes the weight and solemnity, which attaches to and inheres in the verdict of a jury, but the Court is equally familiar with its obligation and duty under certain circumstances to set such verdict aside and, in the instant case feels that it erred in giving Instruction No. 3 thereby placing an unwarranted burden upon defendant coupled with what has previously been said requires the granting of a new trial and it is so ordered. A motion for a rehearing is dispensed with."

■■ After reviewing the entire record we agree with the trial court's conclusion that there was insufficient evidence of causal connection between the bank's negligent record-keeping and the alleged loss to support the verdict of the jury. Negligence to be actionable must proximately cause injury or loss.

In this case the admittedly negligent and careless referral to the box number and the collection of box rental after the time it was shown to have been surrendered was not shown to be the proximate cause of the alleged injury or loss to Cash. The fact of two existing boxes numbered 18, sometimes numbered 18-A and 18-B, could not reasonably be the cause of Cash's alleged loss when Cash by his own admission never dealt with Box 18 in the "A" section; never had any keys to that box; never made any entry into such box and allegedly deposited his valuables in Box 18 in the "B" section of the vault. It was undisputed that all transactions between the bank personnel and Cash concerned only Box 18 in the "B" section, regardless of errors in the box designation on the vault records. It was not claimed or even suggested that the keys to

Box 18 in the "A" section could open or provide access to Box 18 in the "B" section, or that the renter of 18-A ever made an entry into Box No. 18 in section "B." The fact that a second Box No. 18 existed in the "A" section has no relevance in the issue of causation.

In asserting that a dispute was created which called for it to be resolved by the trier of the facts, the only evidence supporting Cash's claim and the jury verdict is the uncorroborated and unsubstantiated statement that he did enter the safe deposit box described on January 21, 1959, and placed the money therein; this, in the face of undisputed testimony that the lock on this box had been changed so that the one key outstanding and not surrendered could not (if later found and produced) fit the new lock; that new keys had been made; that the box was re-rented to the Piastros on August 27, 1954; that Mrs. Piastro entered the box thirteen different times until the box was drilled on January 5, 1960; that during this period the Piastros maintained exclusive possession of the keys to the box; that the bank records show that Cash did not enter the box on January 21, 1959. This record also shows that it was his first appearance in the bank and his first attempted visit to the vault in almost six years.

▪ Viewing the evidence in the light most favorable to Cash, it is insufficient as a matter of law to support the verdict of the jury. In *Henderick v. Uptown Safe Deposit Company*, 21 Ill. App. 2d 515, 159 N.E. 2d 58, the Illinois appellate court reversed a judgment and held that the trial court should have directed a verdict under facts very similar to the facts in the case at bar. Therein it was held that mere proof of loss will not make a prima facie case for a plaintiff, citing *Roberts v. Minier*, 240 Ill. App. 518. In the latter case there are cited numerous decisions from the State of Illinois and elsewhere, presenting a full and logical discussion of the rule.

▪ The court further said that although the burden of going forward with the evidence — not the burden of

proof — shifts to the bank, nevertheless where the bank's proof showed without contradiction that every reasonable precaution was employed to safeguard the property of its renters and its box keys were meticulously accounted for, a case is not made out for a jury.

The Illinois court in *Hendrick, supra,* at 531, then stated:

"* * * It would be a dangerous doctrine and an invitation to fraud to allow a renter to recover upon the mere statement that cash or securities were found missing from his box, or had in some unknown way disappeared, without requiring a fair degree of proof of negligence on the part of a safe deposit company."

In view of our conclusions, it is unnecessary to review the trial court's second reason for granting a new trial, to-wit, that the instructions to the jury were erroneous.

Mr. Justice Pringle not participating.