DuQUOIN NATIONAL BANK, Plaintiff-Appellant, v. VERGENNES EQUIPMENT, INC., Defendant-Appellee.

Fifth District    No. 5—91—0015

Opinion filed September 17, 1992.

Terry Sharp and William K. Richardson, both of Law Office of Terry Sharp, P.C., of Mt. Vernon, for appellant.

Douglas A. Antonik and David M. Raymond, both of Law Office of Douglas A. Antonik, of Mt. Vernon, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

This appeal concerns count I of a three-count complaint filed in the circuit court of Perry County; count I which sought a declaratory judgment to determine the conflicting security and priority interests of two creditors in certain farm equipment. Plaintiff DuQuoin National Bank (the Bank) and defendant Vergennes Equipment, Inc. (Vergennes), filed separate motions for summary judgment. Following a hearing on the motions, the trial court entered an order granting summary judgment for Vergennes on October 10, 1990. The court entered an order on December 7, 1990, denying the Bank's motion to reconsider and finding that there was no just reason for delaying enforcement or appeal. The Bank appeals, arguing that the trial court erred in finding as a matter of law that the letter agreement entered into between Phillip and Jean Provart, debtors, and the Bank on June 23, 1986, constituted a subordination agreement between the debtors and the Bank to the benefit of a class of unnamed third-party beneficiaries of which Vergennes was a member.

On March 6, 1984, the Provarts and Edna Provart Cornia, Phillip Provart's mother, executed a promissory note payable to the Bank in the principal amount of $394,429.90. As part of the collateral for this note, the Provarts also executed a farm security agreement on March 6, 1984, granting to the Bank a security interest in all equipment and livestock "now owned or hereafter acquired by Borrower." In April 1986, Ruth Pierce, an employee of the Bank, mailed the farm security agreement to the Perry County recorder's office for filing. Ms. Pierce sent the required recording fee with the security agreement but provided no instructions as to where the document should be filed. On April 25, 1986, the security agreement was filed in the mortgage records of the Perry County recorder's office rather than in the Uniform Commercial Code (UCC) index.

In 1986, the Provarts defaulted on their loan with the Bank, and the Bank filed a replevin suit in the Perry County circuit court. The Provarts, through their attorney, James W. Morris, then entered into negotiations with the Bank to restructure their obligations. On June 23, 1986, Morris sent a proposed letter agreement to Jerry Smith, an attorney for the Bank, which the Bank later accepted. The letter agreement restructured the note obligation with a principal reduction, achieved by redeeming bank shares owned by Edna Provart Cornia, and an extended amortization schedule for the principal balance. Paragraph (3) of the letter agreement stated, in pertinent part, as follows:

"(3) The remaining principal balance ($292,000.00 plus or minus) will be refinanced over a ten year term with principal payments based upon a twenty year amortization schedule with interest fixed for a term of one year and adjustable each year thereafter based upon the prime rate from time to time changed by Mercantile Bank of St. Louis plus 3½ percent. Interest for the first year of the loan will be 12%. *** *Phillip and Jean Provart will provide a lien on all equipment and livestock which will be a first lien except for those items of equipment subject to a purchase money security interests [sic]*. Provarts will have the right to substitute equipment and livestock. Phillip and Jean Provart will grant to the bank an assignment of their existing Agreement for Warranty Deed as additional collateral security to secure the bank." (Emphasis added.)

In May 1987, after discovering that a UCC search of the Perry County records did not disclose the farm security agreement submitted in April 1986, Ruth Pierce telephoned the recorder's office to discuss the matter. An employee of the recorder's office indicated that she would make a note in the UCC index that the security agreement was on file, and the UCC index in that office shows an entry under the name of Phillip Provart, with the Bank listed as the secured party and the following notation: "Sec. Agree in Mtg. Rec. 161 Pg 439 (Misfiled)." The Bank subsequently conducted UCC searches of the Perry County records to determine the perfection of liens on the personal property of Phillip Provart in January 1988, May 1989, and January 1990. These three searches identified the farm security agreement as a recorded lien.

On October 13, 1988, Phillip Provart purchased from Vergennes a Case IH 1680 Combine and a Case IH 1020 Grain Platform by executing a retail installment contract and a purchase money security agreement. On October 21, 1988, Vergennes filed a UCC financing statement covering this equipment in the Franklin County recorder's office. Later realizing it had mistakenly filed in the wrong county, Vergennes filed a copy of the financing statement with the Perry County recorder's office on December 20, 1989.

On June 19, 1990, the Bank filed its original complaint in the Perry County circuit court seeking to establish its priority interest in the combine and grain platform. Vergennes filed its answer to count I on July 24, 1990, alleging two separate affirmative defenses. Vergennes first asserted that the Bank failed to properly perfect its security interest in the equipment because the UCC index in Perry

County merely noted "Misfiled." The second affirmative defense asserted that Vergennes had a superior interest in the equipment pursuant to Vergennes' mistaken, but good-faith, filing of a UCC financing statement in Franklin County under section 9—401(2) of the UCC (Ill. Rev. Stat. 1989, ch. 26, par. 9—401(2)). On September 25, 1990, Vergennes filed a request for leave to file an additional affirmative defense based upon the letter agreement of June 23, 1986, which Vergennes had learned of during discovery. The trial court granted Vergennes leave to file its third affirmative defense, which asserted that the Bank had subordinated its security interest to Vergennes pursuant to paragraph (3) of the letter agreement and that Vergennes, as a third-party beneficiary, could claim the benefits of the subordination as a member of the alleged class of "purchase money security interest" holders.

At the hearing on the motions for summary judgment, the trial court heard the arguments of counsel for the parties and accepted into evidence the deposition transcripts of Ruth Pierce and Jo David Cummins, executive vice-president of the Bank. The trial court also allowed Mr. Cummins to testify regarding the letter agreement. Cummins stated that the language in the third paragraph regarding liens on equipment was "basically a[n] agreement that was worked up between the Provarts['] attorney and us and it states the terms of the collateral that the bank would be willing to accept in order to continue [Provarts'] loan relationship with our bank." Mr. Cummins testified that the letter agreement was not a subordination agreement. Cummins stated that if the Bank were going to enter into a subordination agreement it would typically give a letter of subordination, followed with a subordinated UCC filing, but that this was not done in this instance.

On October 10, 1990, the trial court entered its order granting summary judgment in favor of the Bank as to Vergennes' first two affirmative defenses and in favor of Vergennes on its third affirmative defense. The trial court's December 7, 1990, order denying the Bank's motion to reconsider stated:

"[N]otwithstanding plaintiff's denial of the same, the letter agreement between the Provarts and the plaintiff entered into on June 23, 1986, does constitute a subordination agreement between the debtors and the plaintiff to the benefit of a class of un-named third-party beneficiaries. The Court finds that the language contained in the letter agreement *** is clear and precise and that the plaintiffs agreed to subordinate first lien

on 'those items of equipment subject to a purchase money security interest.' "

On appeal, the Bank contends that the letter agreement was ambiguous and does not show an expressed agreement by the Bank to subordinate to later unperfected creditors.

A court, in construing a contract, must seek to ascertain the intention of the parties. (*Hammel v. Ruby* (1985), 139 Ill. App. 3d 241, 247, 487 N.E.2d 409, 413.) Therefore, we must look to the letter agreement of June 23, 1986, to determine if a subordination agreement was intended. If a subordination agreement was intended, it must have been expressed in the agreement; a subordination agreement by implication is not recognized. *Western Bank v. Matherly* (1987), 106 N.M. 31, 33, 738 P.2d 903, 906; see also *Kramlich v. Home Federal Savings & Loan Association* (1974), 26 Ill. App. 3d 430, 435, 325 N.E.2d 657, 661-62 (if limitation on scope of lien on pledged accounts was intended, it was necessary that such limitation be expressed in subordination agreement which was executed).

In order to ascertain the intention of the parties, a court must look to the agreement as a whole, to its nature, purpose, and the subject matter with which it deals and, if ambiguous, to the circumstances under which it was made. (*Kramlich*, 26 Ill. App. 3d at 435, 325 N.E.2d at 662.) Generally, words in a contract are to be given their usual and primary meaning at the time of the execution of the contract. Contracts must receive a reasonable construction according to the intention of the parties, if that intention can be ascertained from their language, and a reasonable construction will be preferred to one which is unreasonable. (26 Ill. App. 3d at 435, 325 N.E.2d at 662.) " 'An ambiguous contract will be construed most strongly against the party who prepared the contract and chose the words used, since he is the one who is responsible for the ambiguity ***.' " 26 Ill. App. 3d at 435, 325 N.E.2d at 662, quoting *Marshall Field & Co. v. J.B. Noelle Co.* (1967), 81 Ill. App. 2d 409, 414, 226 N.E.2d 454, 457.

Whether or not ambiguity exists in a written contract is to be determined by the trial court as a matter of law. (*McWhorter v. Realty World-Star, Inc.* (1988), 171 Ill. App. 3d 588, 591, 525 N.E.2d 1205, 1207; *Hammel*, 139 Ill. App. 3d at 247, 487 N.E.2d at 413-14.) Where a question of law is raised by an appeal, this court may determine the issue independently of the trial court's judgment. (*McWhorter*, 171 Ill. App. 3d at 591, 525 N.E.2d at 1207.) An ambiguity exists in a document if the words used can be interpreted in more than one sense or if the agreement is obscure through indefiniteness of expression or

having a double meaning. (*McWhorter*, 171 Ill. App. 3d at 591-92, 525 N.E.2d at 1207; *Srivastava v. Russell's Barbecue, Inc.* (1988), 168 Ill. App. 3d 726, 732, 523 N.E.2d 30, 35.) In this case, ambiguity is alleged to exist in the following language: "Phillip and Jean Provart will provide a lien on all equipment and livestock which will be a first lien except for those items and equipment subject to a purchase money security interests [*sic*]."

■■ If the language contained in the letter agreement is "clear and precise," as the trial court found, the intention of the parties should be easily ascertained. Here, however, reasonable men could differ in interpreting the purpose of the provision in question. The parties could have been agreeing to protect unperfected purchase money security interest holders present in June 1986, at the time of the letter agreement, or, as Vergennes suggests, the parties could have intended to allow all unperfected creditors, present and future, to have superior rights which would normally belong to the Bank. Yet a third reasonable interpretation is that the intention was to acknowledge the special priority rule of section 9—312(4) of the UCC (Ill. Rev. Stat. 1989, ch. 26, par. 9—312(4)), which would give priority to subsequent purchase money security interest holders who properly perfected. Thus, the language in question was ambiguous because the indefiniteness of its terms allowed it to be reasonably interpreted in more than one sense. Because of this ambiguity, we must look to the purpose of the agreement and the circumstances under which it was made to determine the parties' intention.

■■ Here, it is uncontradicted that at the time the letter agreement was drafted, the Provarts' loan was in default and the Bank was going to replevin their equipment and pursue collection. In the letter agreement, assets were provided for principal reduction and as additional security to induce the Bank to restructure the Provarts' debt. Under these circumstances, it would be an unreasonable construction of the agreement to determine that the Bank and the Provarts intended to provide benefits to future creditors who failed to properly perfect. The following evidence of record supports our conclusion on this issue.

Jo David Cummins, executive vice-president of the Bank, testified in a discovery deposition conducted in August 1990 regarding the purpose of the letter agreement:

"Q. Do you know why this was part of the workout agreement in June of 1986 granting a lien on the equipment if the bank had already had a lien?

A. The main reason was I think prior to this filing, our filing was a limited filing in that it described certain equipment. In the agreement, we wanted to pick up all the equipment to strengthen our position from [Mr. Provart's] collateral standpoint. That was the reason for the filing of the security agreement at that time.

Q. Was that also the reason to clarify and put that into the letter of agreement of June 23rd '86?

A. Yes. That's why it was stipulated in there as well.

\* \* \*

Q. In paragraph three \*\*\* there's mentioned that the Provarts were granted first lien except for those items of equipment subject to a purchase money security interest. Was the bank or yourself aware at that time that the Provarts were buying farm equipment via purchase money interest?

A. Was I aware? No.

Q. Were you aware or [did you] contemplate that they would be doing that in the future?

A. As any normal farm customer would do, yes, I would assume they would replace equipment from time to time.

Q. Buy the replacement with a purchase money security interest from another lender?

A. Possibly, sure.

\* \* \*

Q. As long as the Provarts were given credit on a trade-in for another piece of equipment, that would protect the bank's position, wouldn't it?

A. Well, I believe that the security agreement says now or hereafter acquired, so anything that was acquired by them and wasn't perfected properly would be taken into our security agreement. What I'm saying is we weren't limiting ourselves to a certain dollar collateral at a certain point and saying, 'That's all we want.' We're stating we want at least that and anything acquired after that time.

Q. Everything you would get.

A. Correct.

\* \* \*

Q. The question I had was from this point on from '86 and maybe even prior \*\*\* the bank would be receiving a lien on equipment acquired whether it be a first lien or whether it be a lien on equipment that was acquired with a purchase money se-

curity interest. In that case, if it was perfected, it would be a second lien?

A. That's correct."

It is obvious from Cummins' testimony that the Bank desired all the equipment collateral available in order to continue its relationship as lender to the Provarts. Thus, it would be inconsistent for the Bank to subordinate its interest in favor of unperfected future creditors. Additionally, the letter agreement was not prepared with the apparent intention of recording it, nor did it comply with the Bank's normal business practice, when entering into a subordination agreement, of making a subordinated UCC filing. These facts all support the Bank's contention that the letter agreement was "simply a workout document" between the Bank and its distressed borrowers.

It is well established that when a contract is ambiguous, further evidence may be introduced to aid in its interpretation. (*Lewis v. Board of Education of North Clay Community Unit School District No. 25* (1989), 181 Ill. App. 3d 689, 701, 537 N.E.2d 435, 443.) Cummins' uncontradicted testimony at the motion hearing was that the letter agreement was not intended by the Bank as a subordination agreement. Vergennes offered no testimony or evidence from the Provarts or their attorney, who drafted the letter agreement, to support Vergennes' theory that the intent of the parties was to subordinate the Bank's first lien on equipment to an unnamed class of third-party beneficiaries. Given the evidence of record and the fact that the ambiguities within the letter agreement should not be construed against the Bank, which did not prepare the document, we conclude that the trial court erred in finding that the June 23, 1986, letter agreement constituted a subordination agreement under which Vergennes was entitled to priority.

■ Having rejected the basis upon which summary judgment was entered in favor of Vergennes, we must now review the trial court's remaining findings to determine if the judgment may be affirmed on any other basis. (See *Manor Healthcare Corp. v. Soiltest, Inc.* (1989), 192 Ill. App. 3d 934, 940, 549 N.E.2d 719, 723 (reviewing court may affirm judgment of trial court on any basis appearing of record in a case).) As to Vergennes' first affirmative defense, *i.e.*, that the Bank failed to properly perfect within the records of Perry County since the UCC index notation merely noted "Misfiled," the trial court's order stated:

"The Court finds that the security agreement entered into between the debtors and the plaintiff bank which was filed of record April 25, 1986, in the Perry County Recorder's Office

constituted a valid financing statement as defined under Section 9—402 of the Uniform Commercial Code and constituted a valid filing under Section 9—403 of the UCC.

The Court specifically finds that the security agreement between the debtors and the plaintiff bank was not a multi-purpose document since only equipment and livestock were given as collateral. The error of the clerk in the Recorder's Office indexing the filing in the mortgage index rather than the UCC index therefore cannot be imputed to the plaintiff. The Court finds therefore that the plaintiff has perfected a valid security interest in the Case IH 1681 [*sic*] combine and the Case IH 1020 grain platform."

We agree with these findings.

Our review of the record shows that the farm security agreement executed by the Provarts and filed by the Bank meets the formal requisites of a financing statement under section 9—402(1) of the UCC (Ill. Rev. Stat. 1989, ch. 26, par. 9—402(1)). Presentation for filing of a financing statement and tender of the filing fee or acceptance of the statement by the filing officer constitutes filing under Article IX of the UCC. (Ill. Rev. Stat. 1989, ch. 26, par. 9—403(1).) Here, Ruth Pierce, an employee of the Bank, presented the farm security agreement for filing by mailing the agreement and the recording fee to the Perry County recorder's office. The security agreement was accepted by the county recorder's office but was misfiled in the real estate records on April 25, 1986. No instructions were given to the recorder's office regarding where the security agreement should be filed, but the document, which could be used to perfect an interest in either personal property, such as equipment, or collateral associated with real property, listed *only* equipment and livestock.

We believe the trial court was correct in finding that since the security agreement was clearly not a multipurpose document, the error of the clerk in misfiling the document cannot be imputed to the Bank. However, even if the security agreement was a multipurpose document which imposed upon the filing party the responsibility to disclose to the clerk the purpose for recording, the record shows that the Bank, upon discovering the misfiling, directed the recorder's office to transfer the security agreement to the UCC index. Thus, any deficiency by the Bank was cured and notice to future UCC index searchers insured by the Bank's act of contacting the recorder's office in 1987. (*Cf. In re Leckie Freeburn Coal Co.* (6th Cir. 1969), 405 F.2d 1043, 1046, *cert. denied* (1969), 395 U.S. 960, 23 L. Ed. 2d 746, 89 S.

Ct. 2101.) The trial court therefore correctly ruled that the Bank had perfected a valid security interest in the combine and grain platform.

██ Vergennes' second affirmative defense asserted a superior interest to the Bank pursuant to Vergennes' mistaken, but good-faith, filing of its financing statement in Franklin County on October 21, 1988. Section 9—312(4) of the UCC (Ill. Rev. Stat. 1989, ch. 26, par. 9—312(4)) provides that a purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected within 20 days after the debtor receives possession of the collateral. If the perfection is not timely, priority between conflicting security interests in the same collateral is determined strictly by the order of filing. (Ill. Rev. Stat. 1989, ch. 26, par. 9—312(5)(a).) To perfect a security interest in farm equipment, the proper place to file a financing statement is in the office of the recorder in the county of the debtor's residence. Ill. Rev. Stat. 1989, ch. 26, par. 9—401(1)(a).

Here, the trial court held that because it was undisputed that the Provarts were residents of Perry County:

> "Although Vergennes Equipment, Inc. as a holder of a purchase money security interest in the equipment recorded their lien within 20 days of the debtors taking possession of the equipment as required under Section 9—312 of the UCC, their lien was not perfected because it was filed in the wrong county. Therefore, the Court finds that Vergennes Equipment, Inc. did not perfect its rights to a priority lien by recording its lien in the wrong county on October 21, 1988."

Section 9—401(2) of the UCC provides, in pertinent part: "A filing which is made in good faith in an improper place *** is nevertheless effective *** with regard to collateral covered by the financing statement against any person who has knowledge of the contents of such financing statement." (Ill. Rev. Stat. 1989, ch. 26, par. 9—401(2).) Vergennes seeks to convince this court that because it filed a financing statement covering the farm equipment with the Franklin County recorder's office in October 1988, its filing should fall within this provision of section 9—401(2). Vergennes' argument is misguided.

Section 9—401(2) contemplates (1) filing of the financing statement somewhere; and (2) knowledge by a *subsequent* secured party of the contents of such financing statement, referring to the one filed. (*Citizens State Bank v. Peoples Bank* (Ind. Ct. App. 1985), 475 N.E.2d 324, 329; see also *In re Pirsig Farms, Inc.* (D. Minn.

1985), 46 Bankr. 237, 242.) Here, however, the Bank filed its financing statement in June 1986, while Vergennes' improper filing was not made until October 1988. Thus, while Vergennes' misfiled financing statement would be effective against subsequent secured parties who had knowledge of Vergennes' statement, it cannot be effective against the *prior* filed financing statement of the Bank. See *In re Dupont Feed Mill Corp.* (S.D. Ind. 1990), 121 Bankr. 555, 559 n.8 (even if second creditor did fall within erroneous filing provision of section 9—401(2), first creditor would still have superior lien under section 9—312(5) (the first to file or perfect rule), where second creditor's priority date would be February 1984 and first creditor had filed in June 1982). But see *In re Johnson* (N.D. Ill. 1983), 28 Bankr. 292, 297.

Vergennes cannot properly claim the section 9—401(2) defense because the Bank was not a subsequent creditor with a later filing. Thus, the trial court correctly found that Vergennes cannot claim the priority lien benefit of section 9—312(4) by virtue of its mistaken recording in Franklin County on October 21, 1988. Therefore, under section 9—312(5)(a), the Bank has priority over Vergennes' conflicting security interest in the combine and grain platform because the Bank was the first to file and properly perfect its lien in Perry County. Ill. Rev. Stat. 1989, ch. 26, par. 9—312(5)(a).

Given our conclusion that the trial court correctly ruled in favor of the Bank on the first and second affirmative defenses of Vergennes but erroneously found in favor of Vergennes on the third affirmative defense, the judgment of the trial court must be reversed and this cause must be remanded with directions to enter summary judgment for the Bank.

Reversed and remanded with directions.

GOLDENHERSH, P.J., and WELCH, J., concur.