JEWELERS MUTUAL INSURANCE COMPANY, as Subrogee of Annaco Corporation, and as Subrogee of Irving M. Ringel, Inc., Plaintiff-Appellant, v. FIRSTAR BANK ILLINOIS, Defendant-Appellee.—BACHU VAIDYA, Plaintiff-Appellant, v. FIRSTAR BANK ILLINOIS, Defendant-Appellee.

First District (2nd Division)   Nos. 1—00—1670, 1—00—1766 cons.

Opinion filed March 31, 2003.—Rehearing denied July 10, 2003.

McBRIDE, P.J., specially concurring in part and dissenting in part.

Leahy, Eisenberg & Fraenkel, Ltd., of Chicago (Charles M. Fraenkel and Robert Ostojic, of counsel), for appellant Jewelers Mutual Insurance Company.

Charles R. Franklin, of Franklin & Shipley, Ltd., of Chicago (Jay R. Giusti, of counsel), for appellant Bachu Vaidya.

Hinshaw & Culbertson, of Chicago (Lawrence R. Moelmann and Stephen R. Swofford, of counsel), for appellee.

JUSTICE CAHILL delivered the opinion of the court:
In the fall of 1996, more than $1 million worth of loose diamonds

and fine jewelry were stolen from three safety deposit boxes that defendant Firstar Bank Illinois (Firstar) rented to jewel dealers at one of its Chicago branches. Plaintiff Jewelers Mutual Insurance Company (Jewelers Mutual), a subrogee of boxholders Annaco Corporation (Annaco) and Irving M. Ringel, Inc. (Ringel), sued the bank under theories of breach of contract and negligence for the loss of the boxes' contents. In a separate action, the third boxholder, plaintiff Bachu Vaidya, sued the bank under the same theories. In both cases the bank moved for and was granted summary judgment based on an exculpatory clause in the box rental contract. In this consolidated appeal, plaintiffs argue that under the public policy of Illinois even a clearly worded exculpation of negligence is void. Plaintiff Jewelers Mutual also appeals the denial of its cross-motion for summary judgment. Plaintiff Vaidya argues that the trial court abused its discretion in denying his motion for reconsideration of the grant of summary judgment and erred earlier in dismissing count II of his complaint in reliance on *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 88-89, 435 N.E.2d 443 (1982).

The procedural histories of these two cases differ slightly. Jewelers Mutual, as subrogee of Ringel and Annaco, filed its four-count complaint on May 13, 1997, alleging breach of contract and negligence. The bank argued that an exculpatory clause in the contract was valid and that the negligence counts were barred by the *Moorman* doctrine. On April 13, 2000, the trial court granted the bank's motion for summary judgment on all counts, but made no specific findings on the *Moorman* issue orally or in its written order.

Plaintiff Vaidya filed his two-count complaint on June 29, 1999, also alleging breach of contract and negligence. The bank filed a motion to dismiss the negligence count, which the court granted based on *Moorman* on October 13, 1999. The court then granted the bank summary judgment on the breach of contract count on January 21, 2000. Vaidya filed a motion to reconsider the grant of summary judgment, which was denied on April 28, 2000.

We affirm the dismissal of count II of plaintiff Vaidya's complaint. In both cases we reverse the grants of summary judgment in defendant's favor on the breach of contract counts. We grant partial summary judgment to plaintiffs on their breach of contract counts and remand to the trial court to assess damages.

Diamond dealers Annaco and Ringel rented safety deposit boxes at the Firstar branch office at 30 North Michigan Avenue in Chicago for $82 and $72 per year, respectively. Each signed a form contract that stated:

"1. It is understood that said bank has no possession or custody

of, nor control over, the contents of said safe and that the lessee assumes all risks in connection with the depositing of such contents; that the sum above mentioned is for the rental of said safe alone, and that there shall be no liability on the part of said bank, for loss of, or injury to, the contents of said box from any cause whatever unless lessee and said bank enter into a special agreement in writing to that effect, in which case such additional charges shall be made by said bank as the value of contents of said safe, and the liability assumed thereof may justify. *The liability of said bank, is limited to the exercise of ordinary care to prevent the opening of said safe by any person not authorized and such opening shall not be inferable from loss of any of its contents.*" (Emphasis added.)

Neither Annaco nor Ringel entered into the "special agreement" mentioned in the contract. Each insured its inventory through Jewelers Mutual and paid an additional fee for a special endorsement covering the contents of a safety deposit box.

The contract further stated:

"8. Relationship defined, the relationship of the bank and the lessee being hereby agreed to be that of landlord and tenant, not as bailee and bailor."

The contents of the boxes were removed by unauthorized persons in late September or early October 1996. Jewelers Mutual paid $805,552.37 toward Annaco's claimed loss of loose diamonds and $81,848 toward Ringel's claimed loss of fine jewelry. Jewelers Mutual then obtained subrogation rights from both of them. The bank admitted in its answer to the complaint that it was negligent in allowing unauthorized persons access to the safety deposit boxes.

The court's summary judgment order noted that the exculpatory clause stated the bank would not be liable for loss of the contents of the box unless the renter paid additional charges for a special agreement to that effect and that neither insured entered into the special agreement. The trial court also found that the contract: (1) was not a lease of real property subject to the Landlord and Tenant Act (the Act) (765 ILCS 705/1 *et seq.* (West 1998)); (2) was not otherwise against Illinois public policy; and (3) was not ambiguous.

Diamond dealer Vaidya had rented a box for $26 a year at the bank's 30 North Michigan Avenue branch. He signed the form contract quoted above but did not opt for the additional "special agreement." Vaidya sued the bank for an unspecified amount to be proven, but at least $50,000, for diamonds and jewelry discovered missing in late September 1996. The bank again admitted that it failed to exercise ordinary care as required under the contract. The bank moved for dismissal of Vaidya's negligence count under *Moorman*, 91 Ill. 2d at 88-89, and for summary judgment on his breach of contract count

based on the contract's exculpatory language. After the trial court granted both motions, Vaidya filed a motion to reconsider the grant of summary judgment. He argued that the Act (765 ILCS 705/1 (West 1998)) governed the parties' relationship and voided the exculpatory clause. The trial court's findings were identical to those in the Jewelers Mutual action. The court found that the box rental agreement: (1) was not a lease of real property subject to the Act (765 ILCS 705/1 (West 1998)); (2) was not otherwise against Illinois public policy; and (3) was not ambiguous.

■ We review the grant of summary judgment *de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

■ We first note an ambiguity in this contract that affects our analysis of the consequences of a possible breach of the contract by the bank. The contract early on states that "there shall be no liability." But the contract later states that "the liability of said bank is limited to the exercise of ordinary care." Ambiguity in a contract may be construed against the drafter, in this case, the bank. *Signal Capital Corp. v. Lake Shore National Bank*, 273 Ill. App. 3d 761, 772, 652 N.E.2d 1364 (1995). In resolving an ambiguity we may look to the agreement itself. See *Du Quoin National Bank v. Vergennes Equipment, Inc.*, 234 Ill. App. 3d 998, 1003, 599 N.E.2d 1367 (1992) (court looks to agreement as a whole to determine intent of parties, and if ambiguous, to the circumstances under which the contract was made). Here, the parties unambiguously defined their relationship in the contract as landlord and tenant, but then sent mixed signals about liability.

■ By defining their relationship as landlord and tenant, the parties subjected their relationship to the Act (765 ILCS 705/1 (West 1998)). The Act invalidates exculpatory clauses that excuse a landlord from liability for his own negligence. Courts presume parties contract in light of existing law. *Allstate Insurance Co. v. Boston Whaler, Inc.*, 157 Ill. App. 3d 785, 790, 510 N.E.2d 1100 (1987). If they claim to define their relationship by contract as that of landlord and tenant, we must presume that they intended to take advantage of the benefits conferred by the Act, along with the limitations imposed by the Act. Lastly, logical inference would negate an intent to exculpate the bank from its own negligence since the whole purpose of renting a safe deposit box is for reasons of security.

■ All that aside, even if the contract was not ambiguous with regard to the bank's attempt to exculpate itself from liability, such effort would fail by reason of its invocation of the Act (765 ILCS 705/1 (West 1998)). In the absence of contractual language to the contrary,

laws and statutes in existence at the time the contract is executed are considered part of the contract. *Larned v. First Chicago Corp.*, 264 Ill. App. 3d 697, 636 N.E.2d 1004 (1994).

■ Exculpatory clauses pit two public policy interests against each other: (1) a person should be liable for negligent breach of a duty that he owes another; and (2) a person should have the right to freely contract about his affairs. *Simmons v. Columbus Venetian Stevens Buildings, Inc.*, 20 Ill. App. 2d 1, 11-12, 155 N.E.2d 372 (1958). "[E]xculpatory or limitation of damages clauses are not favored and must be strictly construed against a benefitting party ***." *Rayner Covering Systems, Inc. v. Danvers Farmers Elevator Co.*, 226 Ill. App. 3d 507, 512, 589 N.E.2d 1034 (1992). General language is not sufficient to indicate an intention to absolve a party from liability for negligence; the language should be clear, explicit and unequivocal. *Calarco v. YMCA of Greater Metropolitan Chicago*, 149 Ill. App. 3d 1037, 1043-44, 501 N.E.2d 268 (1986). "In this way the plaintiff will be put on notice of the range of dangers for which he assumes the risk of injury, enabling him to minimize the risk by exercising a greater degree of caution." *Garrison v. Combined Fitness Centre, Ltd.*, 201 Ill. App. 3d 581, 585, 559 N.E.2d 187 (1990). The precise occurrence that results in injury, however, need not have been contemplated by the parties at the time of contracting. *Garrison*, 201 Ill. App. 3d at 585.

■ We agree with Jewelers Mutual that, "[j]ust as parties may choose which state's substantive law should apply, the parties here chose that this state's landlord/tenant substantive law should govern their relationship." Jewelers Mutual also argues that the bank, as drafter, effectively subjected itself to the Act, which states:

"Every covenant, agreement or understanding in or in connection with *** any lease of real property, exempting the lessor from liability for damages for injuries to person or property caused by or resulting from the negligence of the lessor, *** in the operation or maintenance of the demised premises or the real property containing the demised premises shall be deemed to be void as against public policy and wholly unenforceable." 765 ILCS 705/1 (West 1998).

The bank argues that the statute does not apply because the contract at issue did not involve the lease of real property. An essential characteristic of such a lease is " 'exclusive possession of the leased premises' " in the lessee. *Chemical Petroleum Exchange, Inc. v. Metropolitan Sanitary District of Greater Chicago*, 81 Ill. App. 3d 1005, 1009, 401 N.E.2d 1203 (1980), quoting *Urban Investment & Development Co. v. Maurice L. Rothschild & Co.*, 25 Ill. App. 3d 546, 550 (1975). The bank claims it never relinquished possession or control

of its vault that contained the boxes, so a statute pertaining to the lease of real property does not apply.

■ We find this argument difficult to follow. The rental here did not apply to the vault as a whole, but only to particular safety deposit boxes within the vault. The lessees rented the space inside the boxes, over which they had exclusive possession for the duration of the contract. The safety deposit box is a fixture attached to the bank vault. "A fixture is often thought of as a former chattel which, while retaining its separate physical identity, is so connected with the [realty] that a disinterested observer would consider it a part thereof. A common example of such a fixture is a furnace. *** A fixture is, by definition, part of the real property." *St. Louis v. Rockwell Graphic Systems, Inc.*, 153 Ill. 2d 1, 4, 605 N.E.2d 555 (1992). "To determine whether an item is personalty and not part of the realty, three factors are considered: (1) the nature of its attachment to the realty; (2) its adaptation to and necessity for the purpose for which the premises are devoted; and (3) whether it was intended that the item in question be considered part of the realty." *A&A Market, Inc. v. Pekin Insurance Co.*, 306 Ill. App. 3d 485, 488, 713 N.E.2d 1199 (1999).

Here, the safety deposit boxes could not be taken out of the bank vault, though they could be removed from the vault wall. Renters had to go to the bank to deposit or remove items from a box. Nor would the boxes be useful unless they were kept inside the vault.

The interesting issue here is whether parties to a contract may define their relationship as something other than what it would be in the absence of an express contractual term. Although the dissent focuses on the characterization of the safety deposit box rental, our analysis turns on the parties' own definition of their relationship. In the context of this case, whether a safety deposit box is real property or personalty is largely irrelevant. If the contract between the bank and the renters of the boxes had not expressly defined their relationship as landlord and tenant, the law would require us to look at the nature of the relationship and define it as the law has defined such relationships in the past—generally, in the case of safety deposit boxes, as bailor and bailee. We find instructive *Motors Insurance Corp. v. American Garages, Inc.*, 98 Misc. 2d 887, 414 N.Y.S.2d 841 (App. Term 1979). A customer garaged a car under a contract that provided "that the relationship between the garage and the customer was to be considered that of landlord and tenant, not bailor and bailee." *Motors Insurance*, 98 Misc. 2d at 889, 414 N.Y.S.2d at 842. The court held that, although "[t]he ordinary relationship between a customer and a garage owner is that of bailor and bailee," the parties were free to define their relationship otherwise by contract. *Motors Insurance*, 98

Misc. 2d at 889-90, 414 N.Y.S.2d at 842. Where the language of the agreement clearly shows an intent to create a landlord-tenant relationship, the contract may be conclusive of that relationship. See *Manahan v. Daily News-Tribune*, 50 Ill. App. 3d 9, 14, 365 N.E.2d 1045, 1049 (1977) ("The parties may enter into a written contract which states their respective rights and duties"); *United States v. Myra Foundation*, 382 F.2d 107, 110 (8th Cir. 1967) ("The written contract *** contains provisions usually found in leases and makes frequent use of the words 'lease' and 'rent.' The contract as a whole appears to clearly reflect the intention of the parties to create a landlord-tenant relationship"); *Quality Management Services, Inc. v. Banker*, 291 Ill. App. 3d 942, 945-46, 685 N.E.2d 367 (1997) (language in occupancy agreement contained language typically found in leases); but see *Central Terrace Co-Operative v. Martin*, 211 Ill. App. 3d 130, 133-34, 569 N.E.2d 944 (1991) (language in occupancy agreement showed no intent to form a landlord-tenant relationship).

■ Construing the contract as a whole, we cannot agree that the parties' relationship was that of bailor and bailee where the contract specifically provides that the parties' relationship is that of landlord and tenant. We are aware of the line of Illinois cases characterizing the lease of a safety deposit box as a bailment. See *Schaefer v. Washington Safety Deposit Co.*, 281 Ill. 43, 117 N.E. 781 (1917); *National Safe Deposit Co. v. Stead*, 250 Ill. 584, 593, 95 N.E. 973 (1911); *Hauck v. First National Bank of Highland Park*, 323 Ill. App. 300, 302, 55 N.E.2d 565 (1944); *Paset v. Old Orchard Bank & Trust Co.*, 62 Ill. App. 3d 534, 538, 378 N.E.2d 1264 (1978). The only relevance of a bailor-bailee argument as opposed to a landlord-tenant argument in the context of this case (the property went missing whether it was bailed or not) is whether the exculpatory clause is valid. If the parties are bailor and bailee, the exculpatory clause is valid. If landlord and tenant, the exculpatory clause is against public policy. Here the parties chose to define their relationship by contract. We note in passing that the contract was drafted by the bank, which chose its terms. *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 493, 505 N.E.2d 314 (1987) (ambiguous language is generally construed against the drafter). "Undoubtedly, the relation being contractual, the plaintiff and defendant might by contract define their respective duties or limit the liability of the defendant, provided the contract was not in violation of law or public policy." *Schaefer*, 281 Ill. at 50.

Here, the paragraph defining the parties' relationship as landlord and tenant was not in violation of law or public policy. But in so defining their relationship they subjected themselves to the law governing

landlord and tenant. That law in Illinois is the Act (765 ILCS 705/1 *et seq.* (West 1998)). The dissent notes that the contract does not expressly state that the Act should govern. But we believe that, by agreeing to a landlord-tenant relationship, the parties necessarily agree to be bound by the laws governing that relationship. A contrary result would require that we ignore the landlord-tenant language in the contract. The trial courts erred in granting defendants summary judgment based on the exculpatory clause.

■ Vaidya also argues that the trial court erred in dismissing count II of his complaint under *Moorman*, 91 Ill. 2d at 88-89. We disagree. Count II alleged that the bank was negligent by failing to properly monitor the vault and prevent unauthorized persons from gaining access to his safety deposit box. *Moorman* held that "[t]ort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence ***. The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown *or nonaccidental cause*, on the other hand, lies in contract." (Emphasis added.) *Moorman*, 91 Ill. 2d at 86. The exception to the rule that purely economic loss is not recoverable under a tort theory is "where one intentionally makes false representations [citation], and where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations [citation]." *Moorman*, 91 Ill. 2d at 88-89. These exceptions do not apply here.

Vaidya cites *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 112 Ill. 2d 378, 493 N.E.2d 1022 (1986), in which the plaintiffs sought damages "resulting from the loss of audio equipment, paint sprayers, speakers, inventory, supplies, and stock" in a fire. *Scott & Fetzer*, 112 Ill. 2d at 388. The supreme court held that the alleged losses did not meet the definition of economic loss established in *Moorman* and so were recoverable under tort theory. *Scott & Fetzer*, 112 Ill. 2d at 388. Because the loss in *Scott* was caused by fire—a "sudden or dangerous occurrence"—it is distinguishable from the loss here. Here, Vaidya sought damages for the loss of personal property held in the safety deposit box. " 'But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule *** that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery.' " *Moorman*, 91 Ill. 2d at 86, quoting W. Prosser Torts § 101, at 665 (4th ed. 1971). Because Vaidya did not allege willful and wanton conduct or one of the exceptions outlined in *Moorman*, he cannot recover under a negligence theory. The trial court properly dismissed count II of Vaidya's complaint.

We reverse the grants of summary judgment in defendant's favor on the contract counts and affirm the dismissal of count II of Vaidya's complaint. Since the bank has admitted it allowed unauthorized access to the safety deposit boxes in both cases, and since we have found that the exculpatory clause in the contracts is unenforceable, we grant in part Jewelers Mutual's cross-motion for summary judgment and direct the entry of partial summary judgment for Vaidya. The only issue remaining on remand is proof of damages.

Affirmed in part and reversed in part; cause remanded.

GORDON, J., concurs.

PRESIDING JUSTICE McBRIDE, specially concurring in part and dissenting in part:

I write to concur only in that portion of the opinion which affirms the dismissal of Vaidya's negligence count. As to the portion of the opinion that reverses the trial courts' grant of summary judgment to Firstar, I respectfully dissent.

I would affirm the decision of the trial courts in these consolidated appeals because I believe the rental agreements were not leases of real property subject to the Landlord and Tenant Act (Act) (765 ILCS 705/1 (West 1998)) and the exculpatory clause used in these two agreements was clear and unambiguous and was not otherwise against public policy. Therefore, the rental agreements should be enforced as written.

In my opinion, the majority has incorrectly concluded that the rental of a safety deposit box is a lease of real property and thus governed by the Landlord and Tenant Act. To reach this conclusion, the majority has ignored several general rules of contract interpretation.

Contrary to the majority, I would not conclude the rental of a safety deposit box is a lease of real property. First, a lease of real property has been traditionally defined as:

> " 'a contract for exclusive possession of lands, tenements or hereditaments for life, for a term of years, or at will, or for any interest less than that of the lessor, usually for a specified rent or compensation. [Citation.] A lease possesses the property of passing an estate in land; it partakes of the nature of an estate, and exclusive possession of the leased premises is essential to its character. [Citations.]' [Citation.]" *Chemical Petroleum Exchange, Inc. v. Metropolitan Sanitary District of Greater Chicago*, 81 Ill. App. 3d 1005, 1009, 401 N.E.2d 1203 (1980).

Two elements missing from these safety deposit box arrangements are real property and exclusive possession. Although the majority has suggested that a safety deposit box is a "fixture," and therefore part of the real property, this conclusion is not supported by any statute or any persuasive case law. In my opinion, a safety deposit box is not real property, but rather personalty.

The second element, exclusive possession, is also missing from these agreements. Here, the lessees' access to the safety deposit boxes was not exclusive and was limited by the terms of the rental agreement. The agreement specifically provided that the bank vault, which housed the safety deposit boxes, could be closed for holidays or "for any other reason said bank shall deem such closing prudent or proper." Thus, unlike a lease of real property, where the tenant enjoys the right to exclusive possession of the property for the term of the lease, the boxholders here only had access to the safety deposit boxes and their contents during bank hours. Because the boxholders did not have exclusive possession of the safety deposit boxes, there can be no lease of real property. Since there was no lease of real property, the Act does not apply.

The majority also concludes that because the parties defined their relationship as that of landlord/tenant, they subjected themselves to the Landlord and Tenant Act. In doing so, the majority has accepted Jewelers' argument that " '[j]ust as parties may choose which state's substantive law should apply, the parties here chose that this state's landlord/tenant substantive law should govern their relationship.' " 341 Ill. App. 3d at 19. This statement is flawed for a number of reasons.

First, the contract does not express this intent. The parties never stated that the Landlord and Tenant Act should govern the contract but only that "the relationship of the bank and the lessee being hereby agreed to be that of landlord and tenant, not as bailee and bailor."

Second, there is no Illinois authority which holds that incorporation of the language cited above into a contract means the parties have subjected themselves to the Landlord and Tenant Act.

Third, the Landlord and Tenant Act would seem to exclude from its coverage the safety deposit box leases here because these boxes are not "living spaces." See *Tobin v. McClure*, 144 Ill. App. 3d 33, 493 N.E.2d 1215 (1986) (holding that the Security Deposit Return Act (now 765 ILCS 710 (West 1998)) is limited to units of residential real property; a unit of residential real property refers to an identifiable living space within a larger structure).

Finally, the City of Chicago ordinance governing the leases of real property (which the majority does not discuss), referred to as the

Residential Landlord and Tenant Ordinance (Chicago Municipal Code § 5—10—010 (1998)), is clearly limited to dwelling units. A dwelling unit under that ordinance is defined as a " 'structure or the part of a structure that is used as a home, residence or sleeping place by one or more persons ***.' *** Chicago Municipal Code § 5—12—030(a) (1990)." *Meyer v. Cohen*, 260 Ill. App. 3d 351, 355, 632 N.E.2d 22 (1993).

Therefore, I would not find the Landlord and Tenant Act governs these contracts.

While it is true that exculpatory clauses are generally not favored, the basis for their enforcement is the strong public policy favoring freedom of contract. *Rayner Covering Systems Inc.*, 226 Ill. App. 3d at 512. The rationale for permitting parties to limit liability was described by the supreme court in *McClure Engineering Associates, Inc. v. Reuben H. Donnelley Corp.*, 95 Ill. 2d 68, 72-73, 447 N.E.2d 400 (1983), where it was said:

"[D]ecisions of this court have consistently reflected a judicial concern with balancing the need to respect the right to freely contract with the need to protect parties from unfair provisions in contracts involving publicly regulated activities. [Citations.] However, in the nonregulated areas the decisions of this court and those of other jurisdictions reflect a widespread policy of permitting competent parties to contractually allocate business risks as they see fit. [Citations.] 'This accords to the individual the dignity of being considered capable of making and standing by his own agreements.' [Citation.]"

Here, the parties clearly agreed that the lease agreement was for the rental of the deposit boxes only and the bank would not be an insurer of the contents unless the parties entered into a separate agreement. There seems to be no public policy reason why the parties could not agree to this term since safety deposit companies are not generally insurers of the safety of the box contents. See *Hauck v. First National Bank of Highland Park*, 323 Ill. App. 300, 302, 55 N.E.2d 565 (1944); *Henderick v. Uptown Safety Deposit Co.*, 21 Ill. App. 2d 515, 517, 159 N.E.2d 58 (1959).

The parties agreed that in order for the bank to be the insurer of the contents, it would charge more money to insure the contents. Consequently, if the bank was paid more than the mere rental fee, the risk of loss would be borne by the bank. It is undisputed that the parties never entered into a separate agreement for this insurance. The record shows that Annaco and Ringel were charged about $80 annually to rent the safety deposit boxes. The record also shows that Annaco paid Jewelers $732 for insurance coverage for the contents of its

safety deposit box. Ringel was also separately insured but the record does not disclose how much he paid for this coverage. Vaidya did not secure insurance.

By its decision, the majority has ignored several rules of general contract construction. First, it has not construed the contract as a whole, giving meaning and effect to every provision thereof, if possible. *Martindell v. Lake Shore National Bank*, 15 Ill. 2d 272, 283, 154 N.E.2d 683 (1958). Instead, the majority has taken the last paragraph and emphasized it to the exclusion of all the other paragraphs. Second, the majority has failed to give weight to the principal apparent purpose and intention of the parties at the time of contracting. *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1020, 538 N.E.2d 205 (1989). The principal purpose was the rental of a safety deposit box; it was not to insure the safety of the holders' contents. The parties clearly understood that the compensation received by the bank, which was about $6.50 a month, was a rental fee, not an insurance premium. The parties expressly stated that if the "lessees" wanted the bank to insure the contents, they were required to enter into a separate agreement and pay an additional sum to justify the risk or liability the bank would thereby assume.

Next, the majority has interpreted the contract in a manner that renders the first provision meaningless, which it should not do. *USG Corp. v. Sterling Plumbing Group, Inc.*, 247 Ill. App. 3d 316, 320, 617 N.E.2d 69 (1993). Lastly, it has rewritten the language of the contracts and incorporated into the contracts provisions of the Landlord and Tenant Act. This is in violation of the rule that the rights of parties to a contract are limited by the terms expressed in the contract and courts may not rewrite language or add provisions to make the agreement more equitable. *Jewel Cos. v. Serfecz*, 220 Ill. App. 3d 543, 548-49, 581 N.E.2d 186 (1991).

Although the parties chose to characterize the relationship between themselves as landlord and tenant, I cannot agree that such language transforms the rental agreement of a safety deposit box into a lease of real property. Nor can I agree that the Landlord and Tenant Act applies to these contracts for the reasons stated above.

Part of the difficulty with these consolidated appeals is an attempt to characterize these contracts as either a lease of real property or a bailment. Unfortunately, the contracts do not fit neatly into either category. They are not really leases because exclusive possession is lacking. Nor are they, in my opinion, really bailments either, because Firstar did not have possession, custody, or control over the contents of the boxes at any time. Nonetheless, it is clear that a safety deposit boxholder has access to the contents of the box that is at least equal

to, and probably greater than, that of the bank. Neither could acquire the box itself without the other, but once acquired, the boxholder has access to the contents in privacy. What is removed from or added to the box is largely a matter that the boxholder alone determines. Therefore, the provision

"that there shall be no liability on the part of said bank, for loss of, or injury to, the contents of said box from any cause whatsoever unless lessee and said bank enter into a special agreement in writing to that effect, in which case such additional charges shall be made by said bank as the value of contents of said safe, and the liability assumed thereof may justify,"

seems reasonable. Moreover, because the actual rental of safety deposit boxes is not regulated by a particular statute, it does not seem a violation of public policy for the parties to have agreed to the exculpatory language entered into here.

Finally, I do not find the first paragraph of these agreements to be ambiguous. The parties agreed the bank would assume "no liability *** for loss of, or injury to, the contents" unless the parties entered into a separate written agreement to "that effect." In the event that the parties entered into this separate written agreement, the liability of the bank would be limited "to the exercise of ordinary care to prevent the opening" by any unauthorized person. This language, in my opinion, is not ambiguous.

I would enforce the contracts as written. Accordingly, I respectfully dissent.